# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00477-CR

**Hubert Theodore Branch, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
### NO. 62025, HONORABLE JOE CARROLL, JUDGE PRESIDING

## O P I N I O N

A jury convicted Hubert Theodore Branch of possession of between four and two-hundred grams of cocaine with intent to deliver, a first-degree felony. *See* Tex. Health & Safety Code Ann. § 481.112 (West 2010). Branch pled true to an enhancement paragraph alleging a previous conviction for the felony offense of delivery of cocaine, and the jury assessed punishment at life in prison and a $5,000 fine. Branch raises three issues on appeal, contending that the trial court erred in: (1) denying Branch's motion to suppress the evidence found during a traffic stop; (2) denying Branch's motion to suppress the evidence discovered in a search of his home after the traffic stop; and (3) denying Branch's motion for new trial based on ineffective assistance of counsel.

Because we conclude that the trial court did not err in denying Branch's motion to suppress, we affirm the portion of the trial court's judgment finding guilt. Because we conclude that the trial court erred in denying Branch's motion for new trial, we reverse the portion of the trial

court's judgment assessing punishment, and we remand this cause to the trial court for a new punishment hearing.

## BACKGROUND

Evidence presented at a hearing on Branch's motion to suppress shows that on September 14, 2007, Detective Joel Wadley of the Killeen Police Department Organized Crime Section was conducting an investigation of Branch. Wadley testified that Branch sold narcotics in Killeen and that Wadley had been investigating Branch for some time. Wadley further testified that on September 14, 2007, he believed that Branch was in possession of cocaine based on information he had learned from a confidential informant. On that day, Wadley was parked down the street from Branch's home on Crockett Drive. While parked, he observed Branch load something into his car, leave the car door open, and walk back inside his house. Wadley then observed Branch walk back outside, get into his car, and drive away. Wadley followed Branch from a distance in an unmarked car. Wadley testified that he followed Branch because he believed Branch was "going to a specific location to drop off some narcotics."

Wadley testified that while he was following Branch, he observed Branch fail to signal his intent to turn on several occasions. Wadley contacted another officer, Officer Willie Wingfield, and asked him to make a traffic stop of Branch's car. A video from Wingfield's patrol car was admitted into evidence during the hearing on the motion to suppress. The video shows Branch failing to signal his intent to turn on at least one occasion. Wingfield responded to Wadley's request and ultimately stopped Branch as Branch pulled into his sister's driveway on Petunia Street. Before Wingfield made the traffic stop, he observed that Branch did not signal his

2

intent to turn onto Petunia Street and provided a "short signal" (his turn signal blinked only once) before he turned into his sister's driveway.

Wadley contacted Detective Carl Pergande, a detective with a trained narcotics-detection dog, and requested that Pergande bring the dog to the site of the traffic stop to conduct an open-air sniff of Branch's car. Pergande was already on his way to the site because Wadley had previously contacted him to inform him that Wadley was surveilling Branch's residence and may need a narcotics-detection dog at some point. Wadley testified that Pergande arrived within approximately seven or eight minutes of the initial stop. The video from Wingfield's patrol car shows that the dog arrived within eight minutes of the traffic stop. Wingfield testified that during the time after the initial stop and before Pergande arrived with the dog, Wingfield was checking Branch's driver's license and insurance information and waiting for a police dispatcher to respond regarding whether Branch had any warrants. Wingfield testified that waiting for Pergande to arrive with the dog did not delay the stop. Wadley testified that during the time after the initial stop and before Pergande and the dog arrived, Wadley informed Branch that he was being stopped for a traffic violation. He testified that Branch told him that he may have failed to signal a turn because he was talking to his son, who was in the car with him. Wadley spoke with Branch's son, who was ten years old, and then allowed the boy to go inside the house.

When Pergande arrived, his police dog, "Justice," conducted an open-air sniff of Branch's car. Justice alerted to the presence of a controlled substance in the vicinity of the driver's door. Pergande asked Branch to step out of the car. Branch initially refused, but after speaking further with Pergande, he stepped out and stood at the back of the car. Officers then began conducting a search of Branch's car. Wadley testified that Branch remained standing at the back of

3

the car and that he put his hands in his pockets several times. Wadley told Branch to stop putting his hands in his pockets and then patted Branch down. Wadley testified that Branch had something in his front, left pocket. Wadley removed the item from Branch's pocket. The item was later determined to be 3.4 grams of crack cocaine. Wadley testified that the cocaine was still wet, indicating that it had recently been cooked and leading him to believe that Branch likely had more cocaine at his house. After the cocaine was discovered in Branch's pocket, officers arrested Branch and took him to jail.

Meanwhile, Wadley began the process of obtaining a search warrant for Branch's home, and Detective Pergande and other officers went to Branch's home to attempt to secure the scene until the search warrant was obtained. When Pergande arrived at Branch's home, he knocked on the door but no one answered. At some point later, Branch's sister arrived at the home to pick up Branch's younger son, who was there with a babysitter. When Branch's sister arrived, Pergande was still waiting outside the house. Branch's sister knocked on the door and identified herself. The woman babysitting Branch's baby answered the door, and Branch's sister walked into the home followed by Pergande and other officers. Pergande told the babysitter that he and the other officers would be preserving the home as a crime scene and that she was no longer free to move around the house. Pergande testified that he and the other officers then walked through the house to ensure that no one else was present. They did not find anyone else. After inspecting the items the babysitter planned to take with her out of the home, the officers told her she was free to leave. They also allowed Branch's sister to leave with Branch's baby. The officers then waited for a search warrant.

4

Wadley eventually obtained a search warrant. During the subsequent search, officers discovered two separate quantities of cocaine—one later determined to weigh 1.8 grams and the other later determined to weigh 12.6 grams.[1]

The State indicted Branch for intentionally or knowingly possessing, with intent to deliver, between four and two-hundred grams of cocaine. The indictment also included an enhancement paragraph alleging that Branch had previously been convicted of the felony offense of delivery of cocaine. Before trial, Branch filed a motion to suppress the evidence obtained in the search of him and his home. At the conclusion of a hearing on the motion, the trial court denied the motion.

The case proceeded to a jury trial, and the jury convicted Branch of possession of between four and two-hundred grams of cocaine with intent to deliver. At the subsequent punishment hearing, Branch pled "true" to the enhancement paragraph. The applicable punishment range was fifteen to ninety-nine years or life in prison. During the State's closing argument, the prosecutor addressed the issue of parole, stating, in part:

> [Branch is] going to get out. You can see. You give him life, fifteen years he's eligible for parole. He is not going to stay in prison until he dies, and that fifteen years, as you can see in here, is tempered by how he's good. Okay? He's a good boy, he stays in prison seven years, eight years. He's going to be done on life. Give him thirty, give him forty, he's going to get out quicker.
>
> It's almost obscene that we have to come to you and tell you that these number games [are] played. It would be much simpler if I could walk in here and tell you he's going to go to prison for what you give him, and that's it.

---

[1] The transcript from the hearing on the motion to suppress does not indicate where in the home the two quantities of cocaine were discovered.

Later in the argument, the prosecutor referred to the issue again, stating, "You're never—even with life—going to send him to prison for fifteen or twenty years. It's not going to happen."

The jury assessed punishment at life in prison and a $5,000 fine. Branch filed a motion for new trial, alleging that his trial attorneys provided ineffective assistance by failing to object to the prosecutor's closing argument regarding parole. The trial court denied Branch's motion by operation of law. Branch appeals his conviction.

## DISCUSSION

Branch raises three issues on appeal, contending that the trial court erred in: (1) denying his motion to suppress the cocaine discovered in his pocket during the traffic stop; (2) denying his motion to suppress the cocaine found in the search of his home; and (3) denying his motion for new trial based on ineffective assistance of counsel. Because Branch's first two issues both relate to his motion to suppress, we address them within the same section below. We then address Branch's third issue separately.

### *Denial of Motion to Suppress*

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion, using a bifurcated standard. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's determination of historical facts, and we review de novo the trial court's application of the law. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *Guzman*, 955 S.W.2d at 88-89. Where the trial court did not make explicit findings of historical facts, we review the evidence in a light most favorable to the trial court's ruling and assume that the trial court

6

made implicit findings of fact supported in the record. *Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000). The trial court is the sole judge of the credibility of the witnesses and their testimony. *Maxwell*, 73 S.W.3d at 281. Where the record does not reflect the trial court's legal theory for denying the motion to suppress evidence, the ruling must be affirmed if it is reasonably supported by the record and can be upheld on any valid theory of law applicable to the case. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

### A. Evidence Discovered During Traffic Stop

Branch does not argue that the traffic stop itself was unreasonable. Rather, he contends that the police officers illegally prolonged his detention in order to allow time for a narcotics-detection dog to arrive to sniff his car. Branch argues that the alleged illegal extension of his detention renders inadmissible any evidence discovered after the initial detention.

We first note that a sniff of the exterior of a car by a trained canine during a lawful traffic stop is not a search within the meaning of the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005); *United States v. Place*, 462 U.S. 696, 707 (1983). Once the detention is extended beyond the initial traffic-stop, however, officers must have reasonable suspicion that the car contains narcotics in order to continue the detention. *See Caballes*, 543 U.S. at 407 (initial traffic stop justifying issuance of warning "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *Crockett v. State*, 803 S.W.2d 308, 311 n.7 (Tex. Crim. App. 1991). An officer may inquire into matters unrelated to the purpose of the traffic stop as long as the stop is not unreasonably extended. *See Parker v. State*, 297 S.W.3d 803, 809 (Tex. App.—Eastland 2009, pet. ref'd). A traffic stop may last as long as reasonably necessary

7

to check the driver's license and car registration and to check for outstanding warrants. *See Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004); *Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000).

Here, Officer Wingfield conducted a traffic stop after Branch failed to signal his intent to turn. Detective Wadley, who was also present at the stop, had previously contacted Detective Pergande, a detective with a trained narcotics-detection dog, to request that the dog do an open-air sniff of Branch's car. As a result, Pergande had already begun driving toward the area of the traffic stop when he received the call to come to the stop. Wingfield testified that during the time after the initial stop and before Pergande arrived with the dog, Wingfield was checking Branch's driver's license and insurance information and waiting for a police dispatcher to respond to him regarding whether Branch had any warrants. Wingfield testified that his actions were the "normal procedure" for a traffic stop and that he proceeded in a "normal fashion." He testified that waiting for Pergande to arrive with the dog did not delay the stop. Wadley testified that Pergande arrived within approximately seven or eight minutes of the traffic stop. The video from Wingfield's patrol car shows that the dog arrived within eight minutes of the traffic stop. Wadley confirmed that Pergande arrived while Wingfield was checking Branch's driver's license and insurance information. Wadley further specifically stated that the dog arrived "[d]uring the time we were doing our regular stop."

Given the evidence regarding the initial traffic stop and the arrival of the drug-detection dog, all of which shows that the dog arrived within eight minutes of the traffic stop and before Wingfield finished conducting normal procedures for a traffic stop, we conclude that the record supports an implied finding by the trial court that the time it took for the dog to arrive did not

8

prolong the initial stop beyond the time reasonably required to complete the mission of the stop. *See Caballes*, 543 U.S. at 407-09; *Kothe*, 152 S.W.3d at 63; *Walter*, 28 S.W.3d at 542; *Crosby v. State*, No. 14-05-00668-CR, 2006 Tex. App. LEXIS 8574, *7-8 (Tex. App.—Houston [14th Dist.] October 5, 2006, pet. ref'd) (initial traffic stop was not unnecessarily prolonged where dog arrived and alerted on car while officer was conducting driver's license and warrant check). Thus, the officers are not considered to have extended the duration of the initial detention in order to wait for the dog and therefore did not need reasonable suspicion to detain Branch until the dog arrived. *See Caballes*, 543 U.S. at 407-09; *Kothe*, 152 S.W.3d at 63; *Walter*, 28 S.W.3d at 542.

The law is well established that as soon as a drug-detection dog alerts on a car, officers have probable cause to search the car without a warrant. *See Parker v. State*, 182 S.W.3d 923, 924 (Tex. Crim. App. 2006); *Haas v. State*, 172 S.W.3d 42, 54 (Tex. App.—Waco 2005, pet. ref'd); *Harrison v. State*, 7 S.W.3d 309, 311 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). Thus, when the dog alerted on Branch's car in this case, the officers at the scene had probable cause to conduct a warrantless search of the car. They also had probable cause to arrest Branch without a warrant. *See $217,590.00 in U.S. Currency v. State*, 54 S.W.3d 918, 923 (Tex. App.—Corpus Christi 2001, no pet.) ("It is well-settled that a trained narcotics dog's positive alert for drugs is sufficient to establish probable cause for an arrest."); *De Jesus v. State*, 917 S.W.2d 458, 461 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd); *Bunts v. State*, 881 S.W.2d 447, 450 (Tex. App.—El Paso 1994, pet. ref'd). Given that the officers had probable cause to arrest Branch, they also were permitted to conduct a search of Branch incident to that arrest. *See Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009); *State v. Ballard*, 987 S.W.2d 889, 892 (Tex. Crim. App. 1999); *Hart v. State*, 235 S.W.3d 858, 862 (Tex. App.—Eastland 2007, pet. dism'd). It is

9

irrelevant whether the arrest occurred immediately before or after the search, as long as probable cause to arrest was established before the search was conducted. *Ballard*, 987 S.W.2d at 892; *Williams v. State*, 726 S.W.2d 99, 100-01 (Tex. Crim. App. 1986). Thus, Wadley's search of Branch's person—which occurred after the dog alerted on Branch's car and before Branch was arrested—was a lawful search incident to arrest. *See Baldwin*, 278 S.W.3d at 371; *Ballard*, 987 S.W.2d at 892; *Hart*, 235 S.W.3d at 862.

Because the canine sniff of Branch's car did not extend his detention, and because the dog's alert on Branch's car furnished probable cause for the officers to arrest Branch and conduct a search of his person incident to arrest, we conclude that the trial court did not err in denying Branch's motion to suppress the cocaine discovered in his pocket.

## B. Evidence Discovered During Search of Branch's Home

In his second issue, Branch contends that the trial court erred in denying his motion to suppress the cocaine found in the search of his home. Specifically, Branch argues that the cocaine found in his home in the search conducted pursuant to a search warrant should have been suppressed because police officers conducted an earlier, warrantless entry into his home. He alleges that the warrantless entry violated the Fourth Amendment's prohibition against unreasonable searches and seizures because there was neither probable cause nor exigent circumstances to justify the entry. *See* U.S. Const. amend. IV.; *Parker v. State*, 206 S.W.3d 593, 597 (Tex. Crim. App. 2006) (requiring existence of probable cause and exigent circumstances in order to conduct warrantless search of private residence). Branch does not assert, and nothing in the record suggests, that any of the cocaine found in Branch's home was found during the warrantless entry. Rather, the record shows that the

10

cocaine was discovered during the later search of the home conducted pursuant to a search warrant. However, Branch asserts that the evidence recovered in the later search should have been suppressed as the "fruit" of the unlawful warrantless entry. We disagree.

The pre-warrant sweep of Branch's home, during which no cocaine was discovered, has no relevance to the admissibility of cocaine obtained in a later search. Even if officers had discovered evidence during their pre-warrant sweep of Branch's home, evidence initially discovered during a pre-warrant search but later recovered pursuant to a valid warrant is admissible if the State can demonstrate that, absent any information learned from the pre-warrant search, law enforcement would have sought, and the judge would have issued, the warrant. *See Murray v. United States*, 487 U.S. 533, 538-41 (1988). Because the record does not give any indication that officers discovered cocaine in their pre-warrant sweep, the constitutionality of the sweep is not relevant to the admission of the evidence that was discovered in the later search. We therefore overrule this issue.

We turn now to the later search of Branch's home that was conducted pursuant to a search warrant. Although it is unclear from Branch's brief whether he means to challenge the validity of the later-obtained search warrant, we will address the issue in the interest of thoroughness and because the validity of the search warrant was discussed at oral argument in this case.

A magistrate may not issue a search warrant without first finding "probable cause" that a particular item will be found at a particular location. *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007). Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate within the four corners of an affidavit, there is at least a "fair probability" or "substantial chance" that contraband or evidence of a crime will be found at the

11

specified location. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). The magistrate may interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences from it. *Flores*, 319 S.W.3d at 702.

As a reviewing court, our duty is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Id*. We apply a highly deferential standard in keeping with the constitutional preference for a warrant. *See Rodriguez*, 232 S.W.3d at 59-60 ("[E]ven in close cases we give great deference to a magistrate's determination of probable cause to encourage police officers to use the warrant process rather than making a warrantless search and later attempting to justify their actions by invoking some exception to the warrant requirement."). A reviewing court should not invalidate a warrant by interpreting the affidavit in a hypertechnical manner. *Id*. at 59. When in doubt, we should defer to all reasonable inferences that the magistrate could have made. *Id*. at 61.

The affidavit filed by Detective Wadley in support of his request for a search warrant for Branch's home included the following facts as establishing probable cause for a warrant: (1) a confidential informant ("First CI") stated that Branch sold large quantities of cocaine; (2) First CI observed a second cocaine dealer purchasing cocaine from Branch's home on many occasions, sometimes multiple times a day; (3) First CI correctly identified Branch in a photo and correctly described Branch's car and house; (4) First CI conducted a controlled buy of 0.6 grams of cocaine from Branch on behalf of Detective Wadley, after which Wadley observed Branch return directly to his home; (5) a second confidential informant ("Second CI") said that Branch was buying approximately four ounces of cocaine a day from another cocaine dealer; (6) a third confidential informant ("Third CI") observed a cocaine dealer purchase up to $1,000 worth of cocaine from

Branch; (7) First CI and Third CI said Branch had recently started to deliver cocaine to his buyers rather than have the buyers pick it up at his home; (8) Wadley's observations of Branch were consistent with First CI and Third CI's statement about Branch recently delivering cocaine because Wadley recently noticed fewer people going to Branch's home and Branch leaving the home more often; (9) on Sept. 14, 2007, Wadley saw Branch's car with its driver door open in Branch's driveway and then observed the car back out of the driveway and drive away; and (10) after observing Branch commit traffic violations, Wadley called a marked police car to conduct a traffic stop of Branch's car, and after a drug-detection dog alerted on Branch's car, Wadley discovered crack cocaine in Branch's pocket.

Also in the affidavit, Wadley attested to his twelve years of experience as a police officer and stated that the information provided in the affidavit was based on evidence and information collected during his investigations into narcotics trafficking in Killeen. He also attested to the reliability of First CI and Third CI.[2]

Based on the information in the affidavit, the magistrate could have inferred that: (1) Branch carried the cocaine that was found in his pocket out of his home; (2) the confidential informants, especially First CI and Third CI, had some familiarity with Branch and his affairs; (3) Branch had recently begun delivering cocaine to buyers rather than allowing buyers to come to his home; and (4) Branch was attempting to deliver cocaine to a buyer when the traffic stop occurred.

Given the facts in the affidavit and the reasonable inferences that could be made from the facts, we conclude that the magistrate had a substantial basis for determining that probable cause

---

[2] In reference to Second CI, Wadley's affidavit states only that Wadley received the information about Second CI from a detective at the Central Texas Narcotics Task Force.

existed to search Branch's home. Although it is possible that Branch took all the cocaine stored at his home with him when he left the home, it is at least as likely that the cocaine in his pocket was just one portion of a larger amount that he was storing in the home. *See id*. at 64. Accordingly, we conclude that the trial court did not err in declining to suppress the evidence discovered in Branch's home pursuant to the search warrant.[3]

### C.      Conclusion Regarding Motion to Suppress

Because we find no error in the trial court's decision to deny Branch's motion to suppress, we overrule Branch's first two issues.

### *Denial of Motion for New Trial*

In his motion for new trial, Branch alleged that his trial attorneys had provided ineffective assistance of counsel. After a hearing, the trial court denied the motion by operation of law. On appeal, Branch contends that the trial court erred in denying his motion because his trial attorneys provided ineffective assistance when they failed to object to the prosecutor's statements during closing argument about the way in which parole law would affect Branch's sentence.

---

[3] At the hearing on the motion to suppress, Detective Wadley testified that one of the reasons he believed that more cocaine might be found in Branch's home after discovering the cocaine in Branch's pocket was that the cocaine in Branch's pocket, which was crack cocaine, was "not even dried yet" and had "just been cooked." Wadley believed that Branch was processing the crack cocaine in his home. The affidavit Wadley filed in support of the search warrant did not include the detail about the crack cocaine being wet. However, we need not focus on the missing detail because we have already concluded that the facts included in the affidavit, coupled with the inferences from those facts, are sufficient to establish probable cause for the search. "The issue is not whether there are other facts that could have, or even should have, been included in the affidavit; we focus on the combined logical force of facts that *are* in the affidavit, not those that are omitted from the affidavit." *Rodriguez v. State*, 232 S.W.3d 55, 62 (Tex. Crim. App. 2007).

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). Accordingly, when analyzing the trial court's decision to deny a new trial based on ineffective assistance of counsel, we view the relevant legal standards through the prism of an abuse-of-discretion standard. *See Ramirez v. State*, 301 S.W.3d 410, 415 (Tex. App.—Austin 2009, no pet.). We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable. *Charles*, 146 S.W.3d at 208. We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were so made. *Id.* Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

It is the defendant's burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). To prevail on the issue, the defendant must show that: (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986) (adopting *Strickland* two-prong test). To establish deficient performance as a matter of law under the first prong, a defendant must show that no reasonable trial strategy could justify counsel's conduct. *See Strickland*, 466 U.S. at 689; *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). A defendant establishes prejudice under the second prong if he shows that a reasonable probability exists that, but for the deficient performance, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *Ex parte Cash*, 178 S.W.3d 816, 818

(Tex. Crim. App. 2005). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694.

In determining whether an attorney's performance was deficient, we apply a strong presumption that the attorney's conduct was within the wide range of reasonable professional assistance. *Id*. at 694-95. We review the effectiveness of counsel in light of the totality of the representation and the circumstances of each case. *See Thompson*, 9 S.W.3d at 813.

### A.      Deficient Performance

Branch's complaint regarding his trial attorneys' performance pertains to his attorneys' failure to object to statements the prosecutor made regarding parole law during the State's closing argument. Before we discuss the propriety of the prosecutor's statements, we will first provide background from the punishment phase of trial regarding the way in which parole law was addressed in the jury charge and both parties' closing arguments. We begin with the jury charge, which stated in part:

> Under the law applicable in this cause, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.
>
> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.
>
> Under the law applicable to this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed or thirty

16

(30) years, whichever is less.[4]  Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time.  However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant.  You are not to consider the manner in which the parole law may be applied to this particular defendant.

Both the State and the defense addressed parole law to varying degrees in their closing arguments.  In the State's initial closing argument, the prosecutor explained the parole-law portion of the jury charge to the jury and displayed a chart to assist in the explanation.  The prosecutor stated:

[P]arole eligibility begins when a defendant has served one-quarter of his sentence, taking in consideration good time and back time.  All right.  Realistically the minimum in this case is fifteen years because of the defendant's prior conviction for distribution.  Parole eligibility would be in three-and-a-quarter years.  If you give him a sentence of the minimum, that's what he's looking at before he's eligible.  A twenty-year sentence is five years; a thirty-year sentence, seven-and-a-half; forty years, ten.  You can see down the chart.  A life sentence is thirty years before he is eligible because thirty years is tops what you're going to do.  Okay?  That's what "parole eligibility" means realistically.  If you assess a sentence on the top line, he will be eligible somewhere along the bottom line.

---

[4] Although the parties did not raise the issue of error in the jury charge, we noticed that the charge is incorrect in tracking the applicable statutory language regarding the time frame in which Branch would be eligible for parole.  The charge states that Branch would "not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed or thirty (30) years, whichever is less."  The statute applicable to this case, which is section 4(b) of article 37.07 of the code of criminal procedure, states that a defendant will "not become eligible for parole until the actual time served plus any good conduct time earned equals one-fourth of the sentence imposed or 15 years, whichever is less." *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(b) (West Supp. 2010).

17

During the defense's closing argument, one of Branch's two trial attorneys addressed parole law as follows:

> This is not a life without parole case. It may well be a life case, and you can determine that. And as [the prosecutor's] wonderful chart shows, life is a term of sixty years. Now Mr. Branch is old enough. Sixty years from now he'll been dead twenty years [sic]. So that's not good. That's fine. You want to give him a life sentence and make sure he dies in prison, then you need to do that.
>
> But, really, when you start looking at it, Texas says life is really sixty years. Then you start to cut that in half, and then you cut that into a quarter—you understand what I'm saying—and so you get a number. Well, okay, fine. And maybe everybody is sitting here saying, "Well, in real time I want him to serve this much time." Doesn't work that way. The parole board changes their standards quicker than I change my socks. But, the end result is [Branch] is going to be affected by that parole law, and it's going to start today in this courtroom in about twenty minutes. Because in about twenty minutes I'm going to be through talking and [the prosecutor] will be through talking. You'll have your twelve individual copies, and you will adjourn to the jury room. And you will be in there, and you'll make a rational decision [as to] what you think this case is worth.
>
> . . . .
>
> Ladies and gentlemen, the defendant will come home some day. The only issue is: When is that "some day" going to be against a whole lot of fancy figuring by the State Board of Pardons and Parole based on what verdict you render and whether or not my client can be an above-board citizen while he's in prison? And I can't give you that guarantee. All I can tell you is, I have every hope that [Branch] has learned something from this so that if and when he gets to [prison], he's not allowed—Now that he's got a record—He's not a fight starter. He doesn't join some prison gang. He just does his time and gets it done and gets it behind him and get[s] back.

Then, in the final portion of the State's closing argument, the prosecutor again addressed the issue of parole. It is this portion of the closing argument that Branch asserts was improper:

18

[Branch is] going to get out. You can see. You give him life, fifteen years he's eligible for parole. He is not going to stay in prison until he dies, and that fifteen years, as you can see in here, is tempered by how he's good. Okay? He's a good boy, he stays in prison seven years, eight years. He's going to be done on life. Give him thirty, give him forty, he's going to get out quicker.

It's almost obscene that we have to come to you and tell you that these number games [are] played. It would be much simpler if I could walk in here and tell you he's going to go to prison for what you give him, and that's it.

. . . .

You're never—even with life—going to send him to prison for fifteen or twenty years. It's not going to happen."

Branch contends that the prosecutor's statements were improper. We agree. Although the State may attempt to clarify the meaning of the jury instructions pertaining to parole law and good-conduct time, *see Taylor v. State*, 233 S.W.3d 356, 359 (Tex. Crim. App. 2007), the State is not permitted to comment on the specific extent to which parole law and good-conduct time may be applied to the particular defendant on trial. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(b) (West Supp. 2010). Here, the prosecutor did not state that Branch would be *eligible* for parole in a certain number of years, but rather stated that Branch would be *out of prison* in that amount of time. The prosecutor did so by using language of certainty, stating that Branch would "be done on life" in seven or eight years if he exhibited good conduct; that Branch would "never" serve as many as fifteen or twenty years if given a life sentence; and that Branch "would be out even quicker" if the jury gave him a thirty- or forty-year sentence.

The prosecutor's statements were improper because they went beyond merely explaining the parole-law portion of the jury charge and because they were also an inaccurate statement of the law. As previously quoted, the law in the jury charge explicitly stated that "[i]t

19

cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities." Thus, according to the law, no one in the courtroom could accurately predict how parole law and good conduct time would be applied to Branch. Yet the prosecutor made just such a prediction by stating with certainty that Branch would be out of prison in seven or eight years if he exhibited good conduct in jail, that he would be out of prison even sooner with a lesser sentence, and that he would never serve longer than fifteen or twenty years of a life sentence. Branch's trial attorneys should have objected to the prosecutor's improper statements.[5] *See Andrews*, 159 S.W.3d at 102 ("Defense counsel has a duty to correct misstatements of law that are detrimental to his client.").

At the hearing on the motion for new trial, Branch's trial attorneys testified regarding their reasons for not objecting to the prosecutor's statements. The first attorney to testify, Jeffrey Parker, explained that he and the other defense attorney, Robert Harris, worked together in representing Branch but that Harris was the attorney responsible for conducting argument during the punishment phase of trial. Parker addressed the prosecutor's statements in the following exchange:

---

[5] The State contends that the prosecutor's statements were proper because they were merely an answer to defense counsel's argument regarding parole. *See Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008) (proper jury argument includes answering argument of opposing counsel). The State further asserts that the prosecutor's statements were merely "a paraphrase" of defense counsel's argument. We disagree. Defense counsel stated that Branch would "come home some day" and that Branch would "be affected" by the parole law, but he also emphasized that the parole board would decide the way in which parole would affect Branch and that the parole board frequently changed its standards. Defense counsel made no mention of the specific time frame in which Branch was likely to be released from prison. The prosecutor went far beyond defense counsel's comments and stated that Branch would "be done on life" in seven or eight years if he behaved himself in prison, that he would be released even sooner if given less than a life sentence, and that he would "never" serve more than fifteen or twenty years of a life sentence. Accordingly, we reject the State's characterization of the prosecutor's statements.

20

Defense:    [D]o you recall the prosecutor's argument? Do you recall him making the argument something along the lines if the jury were to give Mr. Branch a life sentence, that, in fact, it would be somewhat equivalent to a seven years [sic]—that he would be out in seven years?

Parker:     I don't recall that. I recall the prosecutor . . . making the statement that because he would serve a quarter of his sentence, that a thirty-year sentence equated to seven-and-a-half years and he would be back on the streets.

Defense:    Okay. So in other words, the prosecutor indicated to the jury that with a life sentence, Mr. Branch would be back on the streets in seven-and-a-half years? That was the import of the argument as you recall?

Parker:     As I recall.

                    . . . .

Defense:    Okay. And are you—with your understanding of the law, is the prosecutor permitted to make an argument about how the parole laws will apply to a particular defendant?

Parker:     It is my understanding they are not.

Defense:    Okay. And during trial, did you object when the prosecutor made this argument?

Parker:     No. It would not have been proper for me to object.

Defense:    Okay. And that's because Mr. Harris was conducting the argument at that stage of the trial?

Parker:     That's correct.

Defense:    Were you aware of any strategy for not objecting at that point in the trial?

Parker:     I know that Mr. Harris had made some arguments, but at this time, I cannot recall what they were. I was not personally aware of his

21

strategy, but I have not discussed this with Mr. Harris, so I don't—I cannot answer that question.

Defense:     So you didn't discuss trial strategy between the two of you prior to trial?

Parker:      Yes, we did. But not as to—with respect to parole issues.

Defense:     Okay. Not with respect to that particular issue?

Parker:      Correct.

Harris testified that he did not recall the prosecutor making an argument about the application of parole to Branch's sentence. Harris further testified regarding the prosecutor's statements in the following exchange with Branch's appellate counsel:

Defense:     And if the prosecutor had argued how the parole laws would apply to Mr. Branch specifically, himself personally in this case, would that jump out in your mind as an argument that's improper or illegal under the law?

Harris:      It would stand out in my mind as an argument that is reactionary. And the point being there, since paragraph two [of the jury charge] is—very obviously says we can't determine what the parole board is going to do, how they're going to rule, I would have been surprised if [the prosecutor] would have tried to influence a jury, to place themselves in the place of the parole board.

. . . .

Defense:     How would you describe your strategy in not objecting to an argument about parole?

Harris:      Well, my strategy wasn't—there wasn't any specific strategy to ignore things that I think are incorrect.

22

Harris then went on to explain his overall strategy, which was to humanize Branch and point out that Branch would get out of jail someday on parole, at which time he would have responsibilities just like every other human being and should therefore not be "warehoused" in prison until his release.

The testimony of both of Branch's attorneys shows that their decisions not to object to the prosecutor's improper statements were not the result of a particular trial strategy. Parker indicated that he felt it would be inappropriate for him to object when Harris was the attorney conducting argument, and Harris admitted that he did not have a trial strategy in declining to object. Even if they had provided some sort of explanation or apparent strategy, it would likely still be insufficient. *See id*. ("There can be no reasonable trial strategy in failing to correct a misstatement of law that is detrimental to the client.").

The dissent suggests that the defense attorneys' failure to object to the improper statements could be overlooked because by and large, the defense attorneys rendered effective assistance to Branch throughout trial. However, the court of criminal appeals has stated otherwise. *See id*. at 103 (defense attorney's failure to object to prosecutor's misstatement of law was alone sufficient to establish deficient performance). As previously mentioned, the *Andrews* court stated that "[t]here can be no reasonable trial strategy in failing to correct a misstatement of law that is detrimental to the client." *Id*. at 102. Here, the prosecutor misstated the law to Branch's detriment and did so through three separate statements to the jury. Not only did Branch's attorneys not object to the improper statements, but they also testified that they did not have a trial strategy in doing so. Thus, regardless of Branch's attorneys' conduct elsewhere during the trial, Branch has shown based on *Andrews* and his attorneys' testimony that there was no reasonable trial strategy justifying his trial attorneys' failure to object to the prosecutor's improper statements, which is all that is required to

23

establish deficient performance as a matter of law.  *See id*.; *Strickland*, 466 U.S. at 689. Accordingly, we conclude that Branch's trial attorneys provided deficient performance in failing to object to the prosecutor's improper statements.

### B.      Prejudice

As previously stated, to prove the second prong of ineffective assistance, Branch must establish that there is a reasonable probability that the outcome of his punishment hearing would have been different if not for his counsels' deficient performance.  *See Strickland*, 466 U.S. at 694; *Cash*, 178 S.W.3d at 818.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Strickland*, 466 U.S. at 694.  We conclude that the record establishes such a probability in this case.

Here, the prosecutor's improper statements gave the jury the inaccurate impression that a life sentence would result in Branch's release from prison in only seven or eight years, and that in any case, Branch would never serve more than fifteen or twenty years of a life sentence.  If Branch's attorneys had objected to the prosecutor's improper statements, the trial court could have corrected the misstatements and instructed the jury to disregard them.  The gravamen of the uncorrected statements was that the effective maximum period of imprisonment that the jury could impose was only seven or eight years and that the only way the jury could guarantee that Branch served that long was to impose a life sentence.  As a result, the abundant evidence of Branch's bad acts, which is emphasized by the dissent as a basis for confidence in the jury's punishment verdict, actually undermines confidence that the verdict would have been the same without the improper comments.  The jury was presented with evidence of bad acts committed by Branch while also being

24

presented with inaccurate statements from the prosecutor indicating that a life sentence was the only way the jury could ensure that Branch would remain in prison for at least seven years. Given that information, the jury assessed a life sentence.

We also note that a prosecutor acts under the authority of the State and brings a great deal of expertise to a criminal trial. The prosecutor here, speaking from such a place of authority, purported to explain the sentencing provisions in the jury charge when he made the inaccurate statements. As previously explained, the law is well-established that neither the prosecutor nor anyone else in the courtroom could predict how the parole law would apply to Branch. Thus, a person with extensive expertise and authority in criminal matters gave the jury incorrect information with which to assess an appropriate sentence for Branch. It is also significant that the jury heard the inaccurate statements immediately before retiring to deliberate. *See Hall v. State*, 283 S.W.3d 137, 177-78 (Tex. App.—Austin 2009, pet. ref'd).

We conclude that the record establishes that there is a "reasonable probability" that Branch's sentence would have been different if his attorneys had lodged an objection to the prosecutor's misstatements. *See Andrews*, 159 S.W.3d at 103. Thus, Branch has shown that his attorneys' deficient performance prejudiced his defense.

## C. Conclusion Regarding Ineffective Assistance

Given the impropriety of the prosecutor's comments, the lack of a trial strategy in support of declining to object to the comments, and the likelihood that Branch would have received a different sentence if his attorneys would have objected to the comments, we conclude that Branch's

25

trial attorneys provided ineffective assistance in failing to object to the comments and that the trial court abused its discretion in denying Branch's motion for new trial based on ineffective assistance of counsel.

## CONCLUSION

Because we conclude that the trial court did not err in denying Branch's motion to suppress, we affirm the portion of the trial court's judgment finding guilt. Because of the unique combination of circumstances in this case—namely, the improper statements made by the prosecution, the defense attorneys' testimony that they did not have a trial strategy for declining to object to the improper statements, and the fact that Branch was assessed the most severe sentence possible—we conclude that the trial court erred in denying Branch's motion for new trial. Accordingly, we reverse the portion of the trial court's judgment assessing punishment, and we remand this cause to the trial court for a new punishment hearing.

_____

Diane M. Henson, Justice

Before Justices Puryear, Pemberton and Henson;
   Dissenting opinion by Justice Puryear

Affirmed in part; Reversed and Remanded in part

Filed:  March 18, 2011

Publish