# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-10-00760-CR

**Jared Lee Bottorff, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
NO. 65465, THE HONORABLE FANCY H. JEZEK, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Jared Lee Bottorff guilty of murder and assessed his punishment at confinement for 35 years in the Institutional Division of the Texas Department of Criminal Justice and, in addition, imposed a $10,000 fine. *See* Tex. Penal Code Ann. §§ 12.32, 19.02 (West 2011). On appeal, appellant argues that the trial court erred in excluding evidence of the deceased victim's prior acts of violence and asserts that he suffered ineffective assistance of counsel at trial. We affirm the judgment of conviction.

## BACKGROUND

On August 7, 2009, members of a military unit that had recently returned from Iraq gathered for a party at the home of the appellant, Jared Lee Bottorff, and his roommate, Phillip Thomas. Guests included unit members Logan Bowers, Ramon Santos, Leonardo Almeida, and his girlfriend, Kelsey Walsh. At some point, Bottorff left the gathering in Bowers's jeep,

without Bowers's knowledge or permission. As Bottorff drove around, he stopped and offered a homeless man a ride and then offered him a place to stay, inviting the man to come home with him and spend the night.

When they arrived at the house, Bottorff introduced the homeless man, Dan Smith, Jr., to his friends. Santos offered Smith a beer and the two men struck up a conversation as they were seated in the living room. Bottorff went outside to the back patio. Bowers and Almeida joined him out back where they expressed concerns over Bottorff bringing home a stranger and homeless person because they did not know Smith or what he might be capable of doing. They discussed the situation and Bottorff agreed that having Smith in his house was not a good idea. Bottorff expressed that killing Smith would resolve the situation. He said that they were trained soldiers, capable of doing it, and argued that, because Smith was homeless, they could get away with it. Almeida and Bowers tried to talk Bottorff out of killing Smith, explaining they could just ask him to leave. Bottorff seemed to agree, but then declared that he was going to kill Smith. Bowers and Almeida decided that something must be done to defuse the situation and to keep Bottorff away from Smith. They told Bottorff to stay outside while they went in to tell Smith that he had to leave.

Bowers and Almeida went inside to where Smith was seated with Santos, talking about football. They approached Smith and asked him if he would mind leaving because they did not feel comfortable with him there. Smith asked if he could finish his beer, and Bowers and Almeida agreed. After finishing his beer, Smith stood and started toward the door, but forgot his cigarettes and asked to retrieve them. After he did so, Bowers and Almeida began to escort him toward the door.

2

As they were nearing the front door, Bottorff appeared with a pistol in his hand. He placed it against Smith's forehead and accused him of having been disrespectful. Angry, Smith swatted the pistol away from his head.[1] At that point, Almeida and Bowers attempted to physically remove Smith from the residence by pushing him toward the door, and a fight broke out between Smith, Almeida, and Bowers. Santos attempted to intervene. After a brief exchange of punches, things calmed down and Santos and Smith were standing next to the door, Santos expressing regrets about the way things had worked out and telling Smith to "just get out."

Suddenly Bottorff told Santos to move out of the way. Then Bottorff fired his .410 gage shotgun into Smith's head. Smith was unarmed, standing at the door when he was shot. The impact of the shotgun blast propelled him across the door threshold on to the porch. The medical examiner testified at trial that the cause of Smith's death was a shotgun wound to the forehead, fired from a distance of less than ten feet.

After the shooting, Bottorff told the others that they had to help him to clean up and to hide the body because they were his friends. Only Thomas, his roommate, did so. Bottorff got a bottle of bleach and began cleaning the blood from the floor of the porch and Thomas started hosing down the front porch area. They backed Bottorff's car up to the house and loaded Smith's body into the trunk. Bowers, Santos, Almeida, and Walsh left, eventually going to Santos's house where they called the police and their platoon first sergeant to report what had happened.

---

[1] It is unclear from the testimony whether Smith hit the weapon itself or Bottorff's arm when he swatted the weapon away from his head.

After the others left, Bottorff and Thomas took Smith's body to a nearby housing construction site, intending to dispose of it, but after realizing they were "making a mistake," they returned home with the body and sat in the driveway smoking. Approximately 15 minutes later, the police arrived at the residence. Thomas got out of the car and fled. The police detained Bottorff, who was in the driver's seat, and discovered Smith's body in the trunk of his car. Patrol officers also recovered a spent .410 shotgun shell from Bottorff's shirt pocket. The shotgun and a bloody shirt belonging to Bottorff were recovered from the residence.

Bottorff testified on his own behalf at trial giving a different account of the events than all of the other witnesses. He claimed that the fight between Smith, Bowers, and Almeida broke out when Smith threw a punch at Bowers. Bottorff maintained that he did not get involved the scuffle, but said that when he realized his friends were losing, he went and got his shotgun "as a show of force" in accordance with his military training and because he was afraid and wanted to defend himself and his friends. He testified that he approached Smith with the weapon pointed toward the floor and asked him to leave. He repeatedly shouted at the victim to leave. He claimed that he raised the shotgun to his shoulder and the victim took a step toward him, grabbed the weapon, took control of it, and turned it on him. Bottorff testified that he was "staring down the barrel of [his] own weapon" and thought he was going to die. He said that he moved sideways, grabbed the weapon, and the two men struggled over the shotgun until he eventually regained control of it. He then pointed it at Smith and again told him to leave his house. Bottorff said that in response Smith took a step toward him and he shot him in the head.

4

Bottorff admitted cleaning up the scene and taking Smith's body to the construction site for disposal, but changing his mind. He also acknowledged that Smith had no weapon of any kind and had done nothing to cause any fear or alarm in the others while in the house. He further conceded that he had regained possession of the shotgun and that Smith was not exerting deadly force against him when he fired the shot that killed him.

## DISCUSSION

Bottorff raises three issues on appeal. The first point asserts that the trial court erred in excluding evidence of the victim's prior acts of violence. The remaining two points argue that his trial attorneys rendered ineffective assistance of counsel. We reject Bottorff's contentions and affirm his conviction and sentence.

### Evidence of Victim's Prior Acts

During the course of the trial, Bottorff asserted claims of self defense and defense of third persons. Bottorff attempted to offer the testimony of two officers from the Temple Police Department, Officer Jeffrey Bragg and Sergeant Tim Simeroth, to support his self-defense claim. Officer Bragg's proffered testimony reflected that on April 3, 2007, he responded to a domestic disturbance call where he made contact with Teresa Chardt who told him that she had been punched by Dan Smith, the victim in this case. Sergeant Simeroth's proffered testimony reflected that on August 10, 2007, he responded to a disturbance call where, on his arrival, he observed Dan Smith being restrained by officers who eventually had to utilize a baton and pepper spray to gain control of him. Bottorff argued that the testimony of these witnesses was relevant to show the victim's state

5

of mind pursuant to Rule 404 (b) of the Texas Rules of Evidence and as evidence that the victim was the first aggressor. The State objected to the admission of this evidence. The trial court ruled that reputation and opinion evidence of the victim's violent character would be allowed, but that specific acts of the victim would be excluded.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010), *cert. denied*, 131 S.Ct. 2966 (2011). A trial court abuses its discretion in this regard only if its determination "lies outside the zone of reasonable disagreement." *Id.*; *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

The rules of evidence permit a defendant to offer evidence of the victim's character for violence or aggression when the defendant is charged with an assaultive offense. *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009); *see Mozon v. State*, 991 S.W.2d 841, 845 (Tex. Crim. App. 1999). A defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor. *Miller*, 330 S.W.3d at 619; *see* Tex. R. Evid. 404(a)(2). For this purpose, it does not matter if the defendant was aware of the victim's violent character. *Miller*, 330 S.W.3d at 619; *see Mozon*, 991 S.W.2d at 845. Such "uncommunicated character" evidence is admissible, however, only through reputation and opinion testimony.[2] *Miller*, 330 S.W.3d at 619; *see* Tex. R. Evid. 405(a). Here, Bottorff sought to offer

---

[2] A defendant may also offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the reasonableness of his claim of apprehension of danger from the victim. *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009); *Torres v. State*, 71 S.W.3d 758, 760 n.4 (Tex. Crim. App. 2002). This is called "communicated character" because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim,

6

evidence of specific instances of Smith's conduct demonstrating his character for aggression or violence through the testimony of Officer Bragg and Sergeant Simeroth. However, a defendant may not offer evidence of the victim's prior specific acts of violence to prove the victim's violent character and that the victim acted in conformity with that violent character at the time of the assault. *Miller*, 330 S.W.3d at 619. Bottorff was not entitled to offer evidence of any specific prior acts of violence to show that Smith was the first aggressor. *See id.* The proffered testimony was an attempt to prove Smith's conduct in conformity with his violent character, and is prohibited by Rules 404(a) and 405(a). *See id.*

Evidence of the victim's prior specific acts of violence may also be offered for a non-character conformity purpose under Rule 404(b)—such as his specific intent, motive for an attack on the defendant, or hostility. *Miller*, 330 S.W.3d at 620; Tex. R. Evid. 404(b). Such specific acts are admissible only to the extent that they have relevance apart from their tendency to show character conformity. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). For example, in *Tate v. State*, the defendant offered evidence that the victim had threatened to harm him on the night in question. The court of criminal appeals found that the evidence of the specific act was not offered to show character, but to show "the victim's state of mind and possibly his motive for the confrontation with the defendant." *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998). By

---

whether the danger is real or not. *Miller*, 330 S.W.3d at 618; *see Mozon v. State*, 991 S.W.2d 841, 846 (Tex. Crim. App. 1999). This theory does not invoke Rule 404(a)(2) because the evidence is not offered to show that the victim acted in conformity with his violent character. *Miller*, 330 S.W.3d at 618-19. Rather, the defendant is proving his own self-defensive state of mind and the reasonableness of that state of mind. *Miller*, 330 S.W.3d at 618. Here, Bottorff did not know Smith. Thus, he was unaware of any alleged character for violence. Bottorff did not rely on this theory of admissibility at trial and does not raise it on appeal.

7

contrast, in the instant case, the incidents about which Bottorff wished to introduce testimony did not implicate Bottorff in any way. Smith did not make any threat toward Bottorff. Nor does Smith's prior conduct indicate that he had any animosity toward Bottorff. The evidence is not probative of Smith's motivation or state of mind as related to the encounter with Bottorff two years after these incidents occurred. Prior to the night of the shooting, the two men had no knowledge of each other. Therefore, while Bottorff could introduce character evidence—through reputation or opinion testimony—to suggest that Smith was the first aggressor, he could not introduce evidence of these specific acts and events because such evidence was not admissible for other purposes. In this case, the record does not show that Bottorff's proffered testimony of Smith's specific acts of violence or aggression would have been relevant for any purpose other than character conformity. *See, e.g.*, *Smith v. State*, 355 S.W.3d 138, 150-51 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *James v. State*, 335 S.W.3d 719, 728 (Tex. App.—Fort Worth 2011, no pet.).

Because the excluded testimony was evidence of specific instances of conduct not admissible under 405(a) and was prohibited character-conformity evidence under 404(b), we cannot say the trial court abused its discretion in excluding the testimony of these two witnesses. We overrule Bottorff's first point of error.

## Ineffective Assistance of Counsel

In his remaining two points of error, Bottorff complains that he received ineffective assistance of counsel because trial counsel: (1) asserted a self-defense claim at trial, and (2) failed to call a mental health expert to testify in the punishment phase of trial. Subsequent to trial, Bottorff

8

filed a motion for new trial alleging ineffective assistance of trial counsel.[3] After conducting a hearing on the motion, the trial court declined to find that defense counsel provided ineffective assistance of counsel and denied the motion. Both attorneys who represented Bottorff at trial testified at the hearing, explaining their reasoning for implementing the trial strategies they did.

***Standard of Review***

To establish ineffective assistance of counsel, an appellant must demonstrate by a preponderance of the evidence both deficient performance by counsel and prejudice suffered by the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012). The appellant must demonstrate under the first prong that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687-88; *Ex parte Lane*, 303 S.W.3d 702, 707 (Tex. Crim. App. 2009). To meet the second prong, the appellant has to show the existence of a reasonable probability—one sufficient to undermine confidence in the outcome—that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Lane*, 303 S.W.3d at 707. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *Strickland*, 466 U.S. at 700; *see Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

---

[3] The record reflects that appellate counsel was originally appointed to represent Bottorff at trial. At some point, Bottorff's family retained trial counsel who replaced original trial counsel at the request of Bottorff and his family. After trial, appellate counsel (original trial counsel) was again appointed to represent Bottorff. Appellate counsel filed the motion for new trial on Bottorff's behalf and continues to represent him on appeal.

9

In reviewing a claim of ineffective assistance, we must evaluate the quality of the representation from the totality of counsel's representation rather than counsel's isolated acts or omissions. *Strickland*, 466 U.S. at 689; *Perez*, 310 S.W.3d at 893; *see Branch v. State*, 335 S.W.3d 893, 905 (Tex. App.—Austin 2011, pet. ref'd). Appellate review of counsel's representation is highly deferential; we must indulge a strong presumption that counsel's representation falls within the wide range of reasonable professional assistance—that is, we must presume that trial counsel's actions or inactions and decisions were reasonably professional and motivated by sound trial strategy. *Strickland*, 466 U.S. at 686; *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *see Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). To rebut that presumption, a claim of ineffective assistance must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. *See Menefield*, 363 S.W.3d at 592 (citing *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "'The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance.'" *Miller*, 330 S.W.3d at 616 (quoting *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004)); *see Sessums v. State*, 129 S.W.3d 242, 246 (Tex. App.—Texarkana 2004, pet. ref'd).

The burden is on the appellant to affirmatively demonstrate "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Perez*, 310 S.W.3d at 893 (quoting *Strickland*, 466 U.S. at 687). To overcome the presumption that counsel rendered adequate assistance, the appellant must identify the specific acts or omissions of counsel that allegedly constitute ineffective assistance and then affirmatively prove that they fall below the

professional norm for reasonableness. *Strickland*, 466 U.S. at 690; *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Even if an appellant shows that particular errors of counsel were unreasonable, the appellant must further show that they actually had an adverse effect on the defense. *Strickland*, 466 U.S. at 693-95; *Cochran v. State*, 78 S.W.3d 20, 24 (Tex. App.—Tyler 2002, no pet.). Merely showing that the errors had some conceivable effect on the proceedings will not suffice. *Strickland*, 466 U.S. at 693; *Martinez*, 330 S.W.3d at 901. The appellant must prove that counsel's errors, judged by the totality of the representation, not by isolated instances of error or by a portion of the trial, denied him a fair trial. *Strickland*, 466 U.S. at 695.

### *Asserting Self-Defense Claim*

Bottorff first maintains that his trial attorneys were ineffective for asserting a claim of self defense instead of pursuing an excuse-based defense under *Jackson v. State*. While Texas does not recognize diminished capacity as an affirmative defense, both lay and expert testimony of a mental disease or defect that directly rebuts the particular *mens rea* necessary for the charged offense is relevant and admissible unless excluded under a specific evidentiary rule. *Ruffin v. State*, 270 S.W.3d 586, 587-88 (Tex. Crim. App. 2008); *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). Such mental conditions present evidence of an excuse for a criminal offense, that is, the evidence rebuts proof of the defendant's alleged *mens rea*. *See Jackson*, 160 S.W.3d at 573. Bottorff asserts that any reasonable attorney would have pursued a trial strategy attempting to show that his post-traumatic stress disorder (PTSD) reduced his level of culpability, not a claim of self defense. However, simply because this was the trial strategy appellate counsel intended to employ

11

when he was trial counsel does not mean that pursuing another trial strategy falls below an objective standard of reasonableness.

Both of Bottorff's trial attorneys clearly articulated their reasons for asserting a self-defense claim rather than an excuse-based reduced-culpability defense under *Jackson*. They indicated that after a thorough investigation of the case, they felt that asserting an excuse-based reduced-culpability defense was not consistent with the facts of the case. Both attorneys noted that Bottorff consistently asserted that he had acted in self defense—immediately after the shooting to his friends, in statements to law enforcement officials, as well as to them during the course of their representation. According to the testimony of lead counsel, Bottorff also told law enforcement officers that he "was not having a flashback, [and his] mind was clear" when he shot Smith. Neither attorney viewed Bottorff's PTSD as a major contributing factor to the offense. Based on the facts of the case, they did not believe the existence of PTSD reduced Bottorff's level of culpability—that is, the mental condition did not demonstrate that Bottorff's shooting of Smith was a reckless act rather than an intentional or knowing one as alleged in the indictment. Co-counsel indicated that witnesses he talked to during the investigation informed him that Bottorff was "a very competent soldier" who "had won awards for marksmanship." Further, the evidence demonstrated that Bottorff shot Smith at very close range. Consequently, counsel felt it was unreasonable to characterize the shooting as a situation where Bottorff disregarded a risk that Smith would die or failed to perceive the risk of his conduct, the culpable mental states involved in manslaughter and criminally negligent homicide. *See* Tex. Penal Code Ann. §§ 19.04, .05 (West 2011). Rather, the attorneys believed that the facts demonstrated that Bottorff's intent was to shoot and kill Smith—consistent with his training

12

as a military soldier to cause the death of an individual targeted—because he was afraid for his life. Both attorneys were adamant that they felt it was inappropriate to "manufacture a defense when you don't have the facts to support [it]." Based on the reasoning provided by trial counsel, we cannot say that trial counsels' decision to present a self-defense claim was not reasonably professional and motivated by sound trial strategy.[4] Thus, Bottorff fails to demonstrate, on this record, deficient performance by trial counsel.

Further, Bottorff fails to demonstrate that he suffered prejudice as a result of trial counsel's strategy in asserting a self-defense claim. Bottorff's conclusory statement in his brief that "trial counsel's conduct so undermined the adversarial process that the trial cannot be relied on as having produced a reliable result," fails to show the existence of a reasonable probability that but for the assertion of the self-defense claim, the result of his trial would have been different. His conclusory assertion fails to affirmatively demonstrate that had counsel pursued an excuse-based defense based on PTSD the result of the proceeding would have been different.

---

[4] Bottorff argues that the self-defense claim asserted at trial was prohibited "as a matter of law" because the evidence was "undisputed" that Smith never used deadly force "other than the claim by [Bottorff] that Smith took the shotgun away from him." However, as trial counsel indicated at the hearing, the legal issues related to self defense—such as whether Smith used deadly force or Bottorff was in imminent danger—were fact issues for the jury. Counsel was entitled to make decisions about what the anticipated evidence would show relying on what their client told them. Had the jurors believed Bottorff's version of the events, they might have been persuaded that he acted in self-defense and found him not guilty. Furthermore, we note that the defense asserted at trial included a claim of defense of third persons along with the self-defense claim. The trial court denied Bottorff's request for a jury-charge instruction relating to the defense of third persons, but granted an instruction on self-defense.

13

***Failure to Call Mental Health Expert***

Bottorff next contends that his trial attorneys rendered ineffective assistance because they did not call a mental health expert during the punishment phase of trial to testify about his PTSD. During the course of appellate counsel's initial representation of Bottorff, he retained Dr. Jerry Mungadze, a licensed professional counselor who specializes in PTSD, to evaluate Bottorff. Mungadze concluded, among other things, that Bottorff suffered from PTSD. Bottorff argues that his trial counsel were ineffective because they did not offer Mungadze's testimony as mitigation evidence in the punishment phase of trial. To determine if counsel was ineffective during the punishment phase of trial, the individual facts and circumstances of each particular case must be considered and the representation of counsel viewed in its totality. *Riley v. State*, No. PD-1531-11, 2012 WL 4092874, at *3 (Tex. Crim. App. Sept. 19, 2012).

During the hearing on the motion for new trial, trial counsel explained why they chose not to utilize Mungadze as a witness. Both attorneys expressed multiple concerns about calling Mungadze as a witness. First, they were troubled by inconsistencies in his report. One of the attorneys felt the "diagnosis kept changing" because the report documented that "the incident happened because of PTSD and alcohol use that night" but later indicated that "it happened as a result of PTSD and traumatic brain injury." This latter conclusion was particularly troubling to trial counsel because Bottorff's medical records reflected that after initial concerns about traumatic brain injury, it was determined that Bottorff did not suffer from traumatic brain injury. The attorneys also testified that comments in Mungadze's report suggested self defense which, they believed, was inconsistent with his conclusion that PTSD caused the incident.

14

In addition, both of Bottorff's trial attorneys indicated that, in their opinion, Mungadze had serious credibility issues. His background included articles on exorcism, which both attorneys felt subjected him to impeachment by the prosecutor. Further, both expressed their opinion that Mungadze had lost his objectivity. They felt that he was "trying to help" and became more of a treating expert than an objective testifying expert. Also, Mungadze submitted two reports, adding things to the second report. Lead counsel testified that he felt this subjected Mungadze to impeachment for changing his report. Lead counsel also expressed that he thought this expert "would have been found incredible by this jury" and the prosecuting attorney "would have a field day with [him]." Co-counsel agreed, expressing his concern about "what a skilled prosecutor would do on cross-examination."

Finally, counsels' testimony reflected that the trial strategy in punishment was to focus on Bottorff's good character as opposed to provide excuses for his conduct. Counsel attempted to demonstrate that Bottorff was a good person before and after this incident and that this shooting, which he maintained was done in self defense, was an aberration. Trial counsel felt that Mungadze's conclusions were inconsistent with the theory of the case—the assertion of self-defense in guilt-innocence and the good-character issue presented in punishment. In fact, the record reflects that Mungadze reported that Bottorff's PTSD made him "difficult to control," and that Bottorff was unstable and should not have access to weapons. A further concern about presenting expert testimony about Bottorff's PTSD was making the jury afraid of their client. Co-counsel testified that while some jurors might view the PTSD evidence as mitigating, others might view it as aggravating. Trial counsel could have reasonably concluded that presenting evidence of Bottorff's PTSD through

15

Mungadze might have made the jury view Bottorff as an unpredictable, uncontrollable danger to others. Also, we note that trial counsel did present some evidence of Bottorff's PTSD through a family witness who witnessed a PTSD event and directly observed how PTSD affected Bottorff. Both attorneys expressed a preference in this case to provide the PTSD evidence to the jury through a family member rather than a "hired gun." As reflected by their testimony at the hearing, trial counsel wanted to present the PTSD evidence in a limited manner to explain why the shooting was an aberration of Bottorff's good character but wanted to avoid making the jury fear their client or view him as a future threat.

Based on the foregoing reasons provided by trial counsel, we cannot conclude that the decision not to call Mungadze or another mental health expert as a witness during punishment was not an exercise of reasonable professional judgment or was a decision that fell below an objective standard of reasonableness.

Furthermore, Bottorff has failed to demonstrate that such decision prejudiced his defense. The "failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *Perez*, 310 S.W.3d at 894 (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983)). We are not convinced that Bottorff would have benefitted from Mungadze's testimony or any expert testimony regarding his PTSD. Such testimony would have shown that due to PTSD Bottorff was hyper-aroused and reacted unreasonably given the situation, and, as Mungadze said, would "go into an immediate reaction thing" to anything that sounds threatening. Trial counsel could have reasonably concluded that such evidence may just have easily been detrimental to the

16

defense, portraying Bottorff as dangerous and unpredictable and, as trial counsel feared, instilling fear of Bottorff in the jury. We do not see a reasonable probability that expert testimony of his PTSD would have changed the outcome of the punishment phase of Bottorff's trial.

Because we cannot conclude on this record that the performance of trial counsel fell below an objective standard of reasonableness or that Bottorff was prejudiced by any alleged deficiencies, we reject Bottorff's claims of ineffective assistance of counsel. We overrule Bottorff's second and third points of error.

## CONCLUSION

We conclude that the trial court did not abuse its discretion by excluding the evidence of specific acts of the victim's prior conduct. We further conclude that Bottorff failed to demonstrate either deficient performance on the part of trial counsel or that he suffered prejudice due to the strategy decisions counsel made and, thus, has failed to establish that he suffered ineffective assistance of counsel. Accordingly, we affirm the judgment of conviction.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   September 28, 2012

Do Not Publish

17