

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00081-CR

_____

TREKEYMIAN JAMAL ALLISON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 46,569-A

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

A Gregg County jury convicted Trekeymian Jamal Allison of aggravated robbery and assessed a sentence of fifty years' imprisonment. On appeal, Allison argues that the jury charge was erroneous because it failed to properly apply the law of parties and contained an inapplicable definition of the term "aggravated robbery" in the abstract portion of the charge. Allison also complains of the State's improper application of parole law during its closing argument.

We find that Allison was not egregiously harmed by jury charge error. We further find that the State's improper closing argument did not affect Allison's substantial rights. Therefore, we affirm the trial court's judgment.

I.      **Factual Background**

Jose Jimenez was shot in the head on September 8, 2016. Jimenez, who was alone at the time of his attack, woke up in a pool of his own blood and managed to text his friends for help before he lost his vision. His friends immediately came to his aid, rushed him to the Longview Regional Medical Center, and reported to nurse Keisha Marsolan that Jimenez had been "jumped by several men." According to Heath DeGarmo, an officer with the Longview Police Department (LPD), Jimenez described his assailants as four African-American men who had forcibly entered a house on Clearwood Street that was rented by his friends, Rebekah Pratter, Justin Anderson, William Benicasa, and Autumn Blalock. Interviews with Jimenez and his friends eventually led to Allison; his cousin, Markerrion Allison; R.J.;[1] and Sean Owens-Toombs.

---

[1] In this opinion, we refer to the children by initials to protect their identities. *See* TEX. R. APP. P. 9.8.

2

The motivation driving the attack became apparent as the jury heard about the nature of the Clearwood house and the events occurring there on the day of the shooting. At trial, Benicasa admitted that he sold marihuana, and Pratter and Anderson admitted that people often came to the house to smoke marihuana, drink alcohol, and play video games. At approximately noon, the Clearwood house was visited by three African-American men who claimed that students at Pine Tree High School told them they could purchase marihuana there. Pratter testified that, as Anderson and Benicasa spoke to the men, she noticed that one of them had a gun in his waistband. When Anderson and Benicasa said they did not have marihuana to sell, the men offered to sell them drugs and guns. Anderson and Benicasa declined their offer and ended the brief conversation.

A.M. admitted that he was one of the men who had conversed with Anderson and Benicasa. A.M. testified that he left Pine Tree High School in the morning with his friend, D.V., and walked to Allison's house in search of marihuana. While there, A.M. informed Allison that he heard marihuana could also be purchased at the Clearwood house, which was nearby. According to A.M., Allison, who had not heard the rumor, decided to walk to the Clearwood house around noon with A.M. and D.V. to see if they could make a buy. One week after the attack, Anderson and Benicasa were provided with photographic lineups and identified Allison as one of the men they had spoken to around noon.[2]

---

[2]Anderson rated his certainty of the identification as "7-8 certainty on 1-10 scale," and Benicasa rated his certainty a "3 on scale of 1-10."

After the unsuccessful attempted purchase, A.M. testified that the trio returned to Allison's house, but that he left for school shortly after. R.J. testified that he was "smoking and chilling" that night at Allison's home with Markerrion and Owens-Toombs. R.J., who had purchased marihuana from Benicasa at the Clearwood house, left Allison's house to see if he could make a buy. By that time, Jimenez was the only person inside the Clearwood house. Jimenez testified that he cracked the door and saw a hefty African-American high-schooler asking for Benicasa. After Jimenez informed R.J. that no one else was home, R.J. returned to Allison's house and reported his inability to make a drug purchase.

R.J. testified that he returned to the Clearwood house with Allison, Markerrion, and Owens-Toombs two hours later to see if Benicasa had returned. Jimenez testified that he was high on marihuana when he opened the door to the four men, who rushed inside as a shotgun barrel was pushed in Jimenez' face. Jimenez said that, without identifying what they were looking for, the men kept asking him for "it," and Jimenez repeatedly told them there was nothing in the house. Jimenez' response prompted one of the men to strike him in order to get him to kneel. R.J. testified that his group intended to steal marihuana and began turning over the house in search of it. As the men rummaged through the house, the man later identified by R.J. as Owens-Toombs held a handgun to Jimenez.

According to Jimenez, one of the men said, "He keeps looking up, he's starting to piss me off. Go get [Allison]." Jimenez testified that he was hit with a pistol, dragged around the house, and kicked. Toward the end of the assault, Jimenez heard someone say, "You going to die today for no reason. Damn, you going to die today. And hurry up and get [Allison] so I can kill this

4

fool. He keeps looking up at me." Jimenez saw a red laser pointer hovering over his eye just before he was shot in the head with the handgun brandished by Owens-Toombs.

An emergency craniotomy saved Jimenez' life. At trial, Jimenez identified Allison as the perpetrator carrying the shotgun, and R.J. also testified that Allison brandished the shotgun during the crime. A.M., who had walked back to Allison's house after a school football game, testified that he saw Allison, Markerrion, R.J., and Owens-Toombs return to the house. According to A.M., Allison notified Owens-Toombs that he had blood on his shoes. A.M. testified that Owens-Toombs admitted to pulling the trigger. Armando Juarezortega, a detective with the LPD, testified that, according to A.M., Markerrion said they were returning from a robbery, and Allison had encouraged Owens-Toombs to destroy evidence by burning his shoes.

Word of the incident spread throughout the neighborhood. According to both Anderson and Benicasa, Allison returned to the Clearwood house on the following day. Allison acknowledged that Pine Tree students were pointing to him as the perpetrator and told Anderson and Benicasa that he was innocent. Juarezortega testified that his interview with A.M. resulted in a warrant for Allison's arrest and that Allison admitted he had gone to the Clearwood house on the day of the shooting in search of marihuana.

The State's indictment against Allison alleged that he,

while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly cause[d] bodily injury to Jose Jimenez by shooting a firearm in the direction of Jose Jimenez, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm.

5

The State's theory at trial argued that Allison was guilty of the offense alleged in the indictment under the law of parties. After hearing this evidence, the jury convicted Allison as a party to the offense.

## II. Allison Was Not Egregiously Harmed by Jury Charge Error

Allison argues that the jury charge was erroneous because, (1) although the general instructions to the jury informed them of the law of parties, the application paragraph did not authorize a conviction based on party liability and, (2) although Allison was indicted for aggravated robbery by causing bodily injury, the abstract portion of the charge instructed the jury that aggravated robbery is committed by threatening bodily injury. We agree with Allison's first argument, reject his second argument, and find no egregious harm resulting from the failure to mention the law of parties in the application paragraph of the charge. Consequently, we overrule Allison's first two points of error.

### A. Standard of Review

We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d

6

915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id*. (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). Error occurs where the jury is not charged with the law applicable to the case. *See Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015).

The level of harm necessary to require reversal due to jury charge error is dependent on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. Here, because Allison did not object to the charge, we will not reverse unless the record shows the error resulted in egregious harm, such that he did not receive a fair and impartial trial. *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)); *Loun v. State*, 273 S.W.3d 406, 416 (Tex. App.—Texarkana 2008, no pet.). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007).

"Neither party bears the burden on appeal to show harm or lack thereof under this standard." *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). "Instead, courts are required to examine the relevant portions of the *entire* record to determine whether appellant suffered actual harm, as opposed to theoretical harm, as a result of the error." *Id.* "Whether jury charge error is preserved or not, the degree of harm resulting from the error must be measured in

7

light of all four factors identified in *Almanza*." *French v. State*, 563 S.W.3d 228, 237 (Tex. Crim. App. 2018) (citing *Almanza*, 686 S.W.2d at 171). These factors include: "(1) the entire jury charge, (2) the state of the evidence, (3) the jury arguments, and (4) any other relevant information as revealed by the record as a whole." *Id.* at 235–36.

## B.      Examination of Charge Error

"The application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez v. State*, 389 S.W.3d 361, 366–67 (Tex. Crim. App. 2012). "Because that paragraph specifies the factual circumstances under which the jury should convict or acquit, it is the 'heart and soul' of the jury charge." *Id.* at 367.

### 1.      The Application Paragraph Failed to Reference Party Liability

As recited in *Vasquez*,

When a definition or instruction on a theory of law—such as the law of parties—is given in the abstract portion of the charge, the application paragraph must

(1)      specify "all of the conditions to be met before a conviction under such theory is authorized";

(2)      authorize "a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers"; or

(3)      "contain[] some logically consistent combination of such paragraphs."

*Id*. (quoting *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)). Where, as here, an application paragraph contains no reference to the law of parties directly, or indirectly, it is

8

erroneous. *Id.* at 368. Accordingly, we find that the jury charge was erroneous for failing to contain any reference to the law of parties in the application paragraph.

**2.** **Notwithstanding the Abstract Definition of "Aggravated Robbery," the Jury Was Required to Find that Bodily Injury Was Caused as Alleged in the Indictment**

Next, the State's indictment accused Allison of causing bodily injury to Jimenez while in the course of committing theft. While the "accusation" portion of the jury charge correctly described the indicted offense, the abstract portion of the charge defined "robbery" and "aggravated robbery" in terms of threatening or placing another in fear of imminent bodily injury or death instead of causing bodily injury. Thus, Allison argues that the abstract portion of the charge was erroneous. Yet, the application paragraph correctly tracked the language of the indictment and required the jury to find that bodily injury was caused to Jimenez.

"In examining the charge for possible error, reviewing courts 'must examine the charge as a whole instead of a series of isolated and unrelated statements.'" *Id.* (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). Here, because the application paragraph of the trial court's charge tracked the indictment by requiring a finding that he caused bodily injury, we hold that the charge was not erroneous for containing an incorrect definition of "robbery" and "aggravated robbery" in the abstract portion.

**C.** **Allison Was Not Egregiously Harmed by the Lack of a Party Liability Instruction in the Application Paragraph**

In addressing harm, we first "ask whether anything in the balance of the jury charge either exacerbated or ameliorated [the] error." *French*, 563 S.W.3d at 236. Here, the abstract portion of the jury charge instructed the jury on the law of parties, as follows:

9

> A person is criminally responsible as a **"Party"** to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with commission of the offense.

> A person is **"Criminally Responsible"** for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

> Mere presence alone will not constitute one a party to a crime.

The application portion of the charge followed immediately underneath these definitions. Because the charge informed the jurors that the abstract portion of the charge also constituted the instructions they were to follow in deciding whether the defendant had been proved guilty or not, we do not believe that a reasonable jury would simply ignore those instructions. Thus, we find that the jury charge ameliorated the error.

We reach the same conclusion when considering the state of the evidence in this case. At trial, it was undisputed that Allison did not shoot Jimenez. Instead, because the evidence showed that Owens-Toombs shot Jimenez, the State's theory relied on party liability. We find that ample evidence was presented to the jury in support of its decision that Allison was a party to the crime. Juarezortega testified that Allison admitted he "rapped" on the door of the Clearwood house in search of marihuana on the day of the shooting. Jimenez identified Allison as one of the men who had assaulted him, A.M.'s testimony implicated Allison in the crime, and R.J. corroborated Jimenez' identification of Allison as the person brandishing the shotgun during the robbery.

In examining other relevant information, we note that the jury was informed during voir dire that the case was based on the law of parties and was educated about the theory of party

10

liability, which was also mentioned by Allison in his opening statement. In light of the State's trial strategy, the law of parties was discussed and applied in the State's closing argument as well. While the State argued that Allison was guilty as a party because, at minimum, he scouted the Clearwood house at noon, Allison argued that he was merely at the house to purchase marihuana. The jury was required to resolve these conflicting theories in determining guilt/innocence.

We also look to a note sent by the jury after it had examined the following application paragraph:

> You must determine whether the state has proved **Aggravated Robbery**, beyond a reasonable doubt, that on or about the 8[th] day of September, 2016, in Gregg County, Texas, the defendant:
>
> 1.      In the course of committing theft;
>
> 2.      With the intent to obtain or maintain control of the property;
>
> 3.      Intentionally, knowingly, or recklessly;
>
> 4.      Cause bodily injury to Jose Jimenez by shooting a firearm in the direction of Jose Jimenez;
>
> 5.      Used or exhibited a deadly weapon, to-wit: a firearm.

The jury's note read:

> On page 3 of Jury Instructions, if the jury believes Element 5 happened and that [Allison] was involved; knew, and took part in the use and/or exhibition of a deadly weapon but did not actually have a weapon himself, is Element 5 not proven?
>
> In other words, [c]ould "The elements are that the <u>defendant</u>:" be replaced w/ "The elements are that the <u>party or parties</u>:
>
> (If the defendant <u>himself </u>didn't meet all 5 elements, is he not guilty, or is being party on Element 5 enough to ~~have been~~ find guilty?) (along w/ Elements 1-4).[3]

---

[3]The trial court simply referred the jury to the charge.

Allison argues that the jury note documented the jury's "considerable confusion." We disagree. Instead, we find that the jury note indicates the jury's understanding and application of the law of parties to the case. Moreover, because there was no evidence establishing that Allison himself caused bodily injury to Jimenez by shooting a firearm, the jury was required to apply the law of parties in order to find Allison guilty of the offense as set forth in the application paragraph.

After reviewing all four *Almanza* factors, we conclude that Allison was not egregiously harmed by the omission of party liability language in the application paragraph. In light of this finding, and our conclusion that the abstract definitions of "robbery" and "aggravated robbery" did not render the charge erroneous, we overrule Allison's first two points of error.

## III. The State's Improper Closing Argument Did Not Affect Allison's Substantial Rights

In his last point of error on appeal, Allison argues that the trial court erred in overruling his objections to the State's statements during closing argument on punishment because they improperly urged the jury to consider how parole law would be applied specifically to him. We agree.

### A. The State's Statements Were Improper

Allison made the following remarks during his closing:

We don't know under parole and good conduct time, . . . if we assess a sentence what that would be. . . . [U]nder the law applicable in this case the defendant will not be eligible for parole until the actual time is served equals to one-half of the sentence imposed or 30 years, whichever is less. So in other words, in other words, we can't predict the future.

It's -- the next paragraph says it can -- it cannot accurately be predicted how the parole law and good conduct time might be applied to the defendant if he is

12

sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

        . . . .

So this is what gets confusing. . . . If you gave a sentence of 10 years, how much does he have to serve? The answer is at least 5, maybe 10. At 14 years, at least 7, maybe 14. At 15, at least 7 and a half, maybe 15. So y'all can do the math.

        And I know it's frustrating because you say to yourself we want to give him this much time, we're the jury . . . . But that's just the way the law is.

In the State's attempt to address this portion of Allison's argument, the following

transpired:

        [By the State]: [Allison] said, "Can't ever tell what you're going … to do, it's kind of hard." It's easy. Okay? He has to do half before he's eligible for parole. So if you want him to do 30 years in jail, you start your number at 60. . . .

        [By the Defense]: Judge, I object. That's not what the Charge says. Judge, 60 can mean 60, so. . . .

        *THE COURT*: I'm going to sustain and let you rephrase it. . . .

        . . . .

        [By the State]: 60 can mean 60.

        [By the Defense]: Judge, I ask that you instruct the jury as to what the law is in this case.

        *THE COURT*: Folks, you will have my jury charge and you can read it and that is the law.

        [By the Defense]: And I ask for a mistrial, Judge.[4]

---

[4]Because Allison received a favorable ruling and does not complain on appeal that the trial court erred in failing to grant a mistrial, we do not review the propriety of statements made by the State before the trial court sustained Allison's objection. Rather, we include this portion of the transcript to demonstrate that the trial court understood Allison's later-overruled objections.

*THE COURT*:  Overruled.

[By the State]:  *If you want him to specifically be off the street for a certain number of years*, 30 -- *let's just say 20.*  You want him -- "I don't want him on my streets for I know 20 years," *you have to start your number at 40.*

[By the Defense]:  Judge, that's not right. . . .
That's not the law.

. . . .

[By the State]:  It's my argument, Your Honor.

[By the Defense]:  No, what do you mean argument?  That's not the law, Judge.

*THE COURT*:  I'm going to overrule your objection; let you summarize it within the law.  I've already instructed the jury that what the lawyer says is not evidence, you're governed by the evidence and the Court's instructions.

[By the Defense]:  Judge, I ask that you instruct them -- her last statement be stricken from the record, and that's not the law, Judge.

*THE COURT*:  I'm going to overrule, and stay within the law.

. . . .

[By the State]:  If you gave him 60, he could do 60 years, but he would be eligible for parole in 30 years.  That's what the law says.  I know y'all understand that.

(Emphasis added).

The State may explain the existence of parole law during closing argument.  *Taylor v. State*,

233 S.W.3d 356, 358 (Tex. Crim. App. 2007).[5]  This includes paraphrasing or explaining the parole

---

[5]The State relies on *Taylor*, in which the court upheld the State's closing argument, which commented on how parole-eligibility rules worked with forty-, sixty-, and seventy-five-year sentences.  *Taylor*, 233 S.W.3d at 359.  The Texas Court of Criminal Appeals reiterated that the State may accurately restate the law given in the jury charge and explained that the State did not convey any information beyond what was properly contained in the charge when it

14

law instruction in the charge. *Id.*; *Perez v. State*, 994 S.W.2d 233, 237 (Tex. App.—Waco 1999, no pet.). However, it is improper for the State to apply the parole law specifically to the defendant during jury argument. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (West Supp. 2018); *Branch v. State*, 335 S.W.3d 893, 907 (Tex. App.—Austin 2011, pet. ref'd); *Perez*, 994 S.W.2d at 237. "[A] thin line separates 'paraphrasing' and 'applying' parole law to a particular defendant." *Perez*, 994 S.W.2d at 237.

We find that the State's argument crossed the line. *See Branch v. State*, 335 S.W.3d 893, 907 (Tex. App.—Austin 2011, pet. ref'd). The State told the jury it had "to start [its] number at 40" to keep Allison off the street for twenty years. That argument was improper because it encouraged the jury to (1) consider the manner in which parole law would apply to Allison and (2) assess a higher sentence based on application of parole information. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(b) ("You are not to consider the manner in which the parole law may be applied to this particular defendant."); *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004) ("[T]he jury is simply prohibited from considering how parole law and good time would be applied to a particular defendant."). Thus, the trial court should have sustained Allison's objection to this argument.

### B.     Allison Was Not Harmed by the State's Argument

We must now determine if this error was harmful. Because the error here involves a Texas statutory right, rather than a constitutional right, we utilize Rule 44.2(b) of the Texas Rules of

---

explained the parole eligibility rules. *Id.* Because the State specifically applied parole laws to the defendant in this case, *Taylor* is easily distinguishable.

Appellate Procedure. TEX. R. APP. P. 44.2(b); *see Hawkins*, 135 S.W.3d at 77; *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000) ("most comments that fall outside the areas of permissible argument will be considered to be error of the nonconstitutional variety"). Under Rule 44.2(b), we utilize a three-part test to determine if the argument was harmful: "(1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed)." *Hawkins*, 135 S.W.3d at 77; *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

### 1. Severity of the Misconduct

Here, the excerpted transcript above constituted the entirety of the improper argument, and parole law was not later mentioned by the State. Nevertheless, the implication of the State's argument was that the jury could only ensure Allison would serve the desired sentence by doubling it to guarantee Allison could not be released on parole before he had served the desired sentence. We find that this factor weighs in favor of a finding of harm.

### 2. Curative Measures

The trial court employed curative measures to minimize the effect of the State's argument. The trial court initially sustained Allison's first objection, which informed the jury that "60 can mean 60." Immediately after the State's improper argument, the trial court cautioned the State to "stay within the law," informed the jurors that counsel's statements were not evidence, and reminded them that they were bound by the law contained in the trial court's charge on punishment. The punishment charge correctly instructed the jury that it could not consider the application of

16

parole law in assessing Allison's sentence.[6]  "[W]e generally presume that a jury will follow the [trial court's] instructions."  *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).  We conclude that this factor weighs against a finding of harm.

### 3.      Certainty of the Punishment Assessed Absent the Misconduct

Last, we conclude that the jury would likely have given Allison the same punishment even if the State had not made the improper comments.

Allison was twenty-one years old at the time of trial.  During guilt/innocence, the jury heard that Allison had brandished a shotgun during the violent burglary, which resulted in Jimenez' shooting, and had encouraged Owens-Toombs to destroy evidence by burning his bloody shoes. The State also presented evidence that Allison's home was a gathering place for people, including high-school students, to smoke marihuana.

The jury also heard that Allison had a lengthy history of criminal activity, even as a juvenile.  Between 2012 and 2015, Allison was either adjudicated for or convicted as an adult for the following offenses:  burglary of a habitation, two counts of possession of marihuana, possession of a controlled substance, theft of a firearm, and burglary of a building.  After his eighteenth birthday, Allison was convicted of two counts of unlawful possession of a firearm by a felon and had pending cases for possession of a controlled substance and forgery.  The State briefed the jury on jail incident reports concerning Allison's violation of jail policy and discussed an incident where Allison reached in his pocket and assumed a shooter's stance after evading arrest

---

[6]The use of a proper jury instruction is a factor to consider in determining curative measures.  *Hawkins*, 135 S.W.3d at 84.

17

by a police officer. Given his criminal history, the State asked the jury to assess a seventy-five-year sentence. In light of all of this uncontroverted evidence, we find that the jury likely would have concluded that Allison was unable or unwilling to change his behavior and assessed a fifty-year sentence, even without the State's comments on parole law. Accordingly, we find that the third factor weighs against a finding of harm.

After balancing these three factors, we conclude that the trial court's decision to overrule Allison's objections to the State's comments did not affect Allison's substantial rights. Accordingly, we overrule Allison's last point of error.

## IV.    Conclusion

We affirm the trial court's judgment.


Ralph K. Burgess
Justice


Date Submitted:    February 19, 2019
Date Decided:      March 28, 2019

Do Not Publish