In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00248-CR
NO. 09-18-00249-CR
_____

**TODD PARKER NEUWIRTH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 17-09-11252-CR, 17-09-11254-CR**

**MEMORANDUM OPINION**

After the trial court denied appellant Todd Parker Neuwirth's motion to suppress, a jury found him guilty on two charges, tampering with a governmental record and the fraudulent use or possession of identifying information. In five issues on appeal, Neuwirth argues that the trial court erred by denying his motion to suppress and that the evidence was legally insufficient to support his conviction for

the offense of tampering with a governmental record. In trial cause number 17-09-11252-CR, we reverse the trial court's judgment and render a judgment of acquittal. In trial cause number 17-09-11254-CR, we affirm the trial court's judgment.

## BACKGROUND

A grand jury indicted Neuwirth for tampering with a governmental record and for the fraudulent use or possession of identifying information. *See* Tex. Penal Code Ann. §§ 32.51(c)(3), 37.10(a)(1) (West 2016). Neuwirth filed a motion to suppress evidence seized from the traffic stop that led to the search of his vehicle. Neuwirth asserted that he was subjected to a warrantless search and seizure that went beyond the scope of the alleged pretextual traffic stop, which Neuwirth contends was a fishing expedition to search his vehicle for unrelated criminal activity. Neuwirth argued that his seizure was unlawful because it was prolonged beyond the time reasonably required to complete the investigation of the traffic offense, and that the dog sniff was an unreasonable search because it was conducted after the traffic stop was completed. According to Neuwirth, the traffic stop was merely a ruse to bypass the need for a warrant or probable cause, and because he did not consent to the search, all the evidence obtained from the illegal search was inadmissible. The trial court did not conduct a pretrial hearing on the motion to suppress because the parties agreed to carry the motion during the trial.

2

The trial court denied Neuwirth's motion to suppress during the testimony of Officer Michael St. Romain, a certified K9 officer with the Splendora Police Department. St. Romain testified that his dog is trained in narcotics detection and has several ways of alerting when drugs are present. St. Romain explained that a false positive, which occurs when a dog alerts to the actual odor of a narcotic that is no longer present, is a valid alert. St. Romain testified that he is not allowed to prolong a traffic stop to see if the dog will alert on a vehicle, and he cannot coerce the dog to make a positive alert. St. Romain testified that he knows the odor of narcotics is present when a dog alerts on a vehicle, and a dog alert gives him probable cause to search the vehicle without a search warrant.

St. Romain testified that he was on patrol on the morning of September 15, 2017, when he observed a vehicle traveling at a high rate of speed that he described as being "very dangerous[.]" St. Romain explained that the speed was unsafe due to the existing circumstances and traffic patterns in the area. St. Romain testified that after he observed the vehicle change lanes without using a turn signal, he initiated a traffic stop. St. Romain explained that Neuwirth was driving the vehicle, and Neuwirth provided a Texas identification card and reported that his driver's license had been expired for about a year. According to St. Romain, Neuwirth claimed that

3

he had insurance and could access it on his cellular phone, but Neuwirth never displayed it.

St. Romain testified that during the stop, he observed that Neuwirth was very evasive, failed to keep eye contact, and kept looking down at a backpack in the floorboard of the front passenger seat. St. Romain also testified that he observed what appeared to be a switchblade or a large knife and the butt of a handgun in the center console. After Neuwirth denied consent to search his vehicle, St. Romain asked Neuwirth to exit the vehicle for safety purposes and conducted a frisk to check if Neuwirth had any weapons on his person. St. Romain explained that he waited for backup to arrive and for dispatch to run a check on the identification number that Neuwirth had provided. After backup arrived, St. Romain advised Neuwirth that he was going to run his dog on the vehicle, and at that point, St. Romain explained he had not completed the traffic stop. According to St. Romain, he only intended to allow the dog to do an open-air search of the exterior of the vehicle. St. Romain testified that his dog positively alerted on the vehicle by jumping on the hood, standing up at the door, and jumping through the driver's side window and lying down with his face buried in the backpack located in the front passenger seat. St. Romain explained that once the dog alerted on the vehicle, he had probable cause to search the vehicle, and he detained Neuwirth while he conducted the search.

4

At that point, defense counsel objected, and the trial court dismissed the jury and conducted a hearing on Neuwirth's motion to suppress. During the hearing, St. Romain testified that Neuwirth was traveling at a high rate of speed and that he had to accelerate to high rates of speed to catch up with Neuwirth, and St. Romain explained that he observed Neuwirth change lanes. According to St. Romain, he pulled Neuwirth over for driving at an unsafe speed and making an unsafe lane change.

St. Romain testified that Neuwirth reported that his driver's license was expired and that he had previous convictions for possession of a controlled substance and bank fraud, and that Neuwirth never provided proof of insurance. St. Romain also testified that he observed a large knife in plain view, and that Neuwirth was acting fidgety, evasive, and was focused on the center console and a backpack that was in the floorboard of the front passenger seat. According to St. Romain, when Neuwirth lifted the center console, he saw other knives and what appeared to be the handle of a gun. St. Romain explained that he asked Neuwirth to exit the vehicle because of safety concerns. St. Romain testified that when he asked Neuwirth if he had anything illegal in the vehicle, Neuwirth stated that he did not have any drugs. St. Romain described Neuwirth as evasive and explained that it was not a normal traffic stop.

5

St. Romain testified that he could not write a citation after he frisked Neuwirth because, at that point, he did not know if Neuwirth had a driver's license or insurance. St. Romain explained that Neuwirth was detained when the dog positively alerted on the backpack in the vehicle and when St. Romain searched the vehicle. After considering St. Romain's testimony and viewing St. Romain's in-car video, the trial court denied the motion to suppress, and St. Romain continued with his direct testimony.

St. Romain explained that he had a recording device in his vehicle that recorded the stop, and the trial court admitted the video of the stop and the items seized from Neuwirth's vehicle. St. Romain testified about the contents of the backpack, including a digital scale used for the distribution of narcotics which had a crystal white substance on it that field tested positive for methamphetamine. St. Romain explained that the backpack contained a laptop, hard drives, USB drives, check printing paper, debit cards, different forms of identification, driver's licenses, and social security cards. St. Romain testified that he found printers in the backseat of the vehicle and in the trunk. St. Romain also recovered a checkbook and a temporary identification card with R.P.'s name on it, and St. Romain explained that the identification card containing R.P.'s identifying information had Neuwirth's photograph on it.

6

Sergeant James Teller of the Splendora Police Department testified that he prepared a search warrant for the electronic devices found in Neuwirth's vehicle to collect further evidence of the fraudulent use of identifying information. Teller explained that he took the warrant and the evidence to the crime lab at the Montgomery County Sheriff's Office. Officer Scott Pierman of the Splendora Police Department testified that after Neuwirth was arrested, he interviewed Neuwirth at the jail, and during the recorded interview, Neuwirth stated that he had paid an individual one hundred dollars for the personal information the police found in his possession. Neuwirth also stated that someone had given him R.P.'s checkbook and that he had made an I.D. and tried to purchase gas with it.

Tim Slusher, a computer forensic examiner for the Montgomery County Sheriff's Office Crime Lab, testified that he received a search warrant request to examine the laptop computer, hard drives, USB drives, and a cellular phone, and Slusher created summary reports of the information that he extracted from the devices. Slusher explained that, among other things, he found templates that appeared to be for Texas identification cards and various identification-style photos of individuals. Slusher testified that he found temporary identification cards and permits, which are governmental records and which contained Neuwirth's photograph.

R.P. testified that his checkbook was found in Neuwirth's possession and that he did not give Neuwirth permission to have the checkbook. R.P. identified Neuwirth during the trial and explained that he remembered meeting Neuwirth outside of his home after Hurricane Harvey, and that Neuwirth was going through the debris that R.P. had thrown away. R.P. testified that Neuwirth also had an identification card with R.P.'s identifying information, which R.P. did not give Neuwirth consent to use. A.B. testified that a photocopy of her driver's license and social security card and a check made payable to her were found in Neuwirth's possession. A.B. testified that she did not know Neuwirth or how he got her identifying information, and she did not give him consent to use her information. K.W. testified that her social security card was found in Neuwirth's possession, and K.W. did not know Neuwirth or give him consent to possess or use her identity. K.W. explained that she lost her driver's license and social security card when her purse was stolen.

The jury found Neuwirth guilty of the offense of tampering with a governmental record and the offense of fraudulent possession of items of identifying information, found the enhancement paragraphs to be true, and assessed punishment in each case at seventy-five years of confinement. The trial court ordered that the sentences would run concurrently.

8

ANALYSIS

In issue five, Neuwirth argues that the evidence was legally insufficient to support his conviction for the offense of tampering with a governmental record. Neuwirth argues that the evidence showed that the identification card is fictitious and therefore not a governmental record within the purview of section 37.10(a)(1). *See* Tex. Penal Code Ann. § 37.10(a)(1). Although the State concedes that several witnesses described the temporary identification card as being false or fictitious, the State argues that while the record is unclear regarding the mechanism by which Neuwirth manufactured the fraudulent temporary driver's license, a rational juror could have concluded, beyond a reasonable doubt, that Neuwirth falsely altered an existing governmental record when he placed his picture on a temporary driver's license permit alongside the victim's information. Because this issue, if sustained, would result in rendition, we address it first. *See Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see also* Tex. R. App. P. 47.1.

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The factfinder is the ultimate authority on the credibility of

witnesses and the weight to be given their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give full deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 16-17).

In some cases, sufficiency of the evidence turns on the meaning of the statute under which the State prosecuted the defendant. *Alfaro-Jimenez v. State*, No. PD-1346-17, 2019 WL 2814864, at *4 (Tex. Crim. App. July 3, 2019) (not yet published). The offense of tampering with a governmental record can be committed six different ways and may involve a real or falsified governmental record. *See* Tex. Penal Code Ann. § 37.10(a); *Alfaro-Jimenez*, 2019 WL 2814864, at *4. Here, the State charged Neuwirth with committing an offense under section 37.10(a)(1). *See* Tex. Penal Code Ann. § 37.10(a)(1). The indictment alleged that Neuwirth

10

did then and there, with intent to defraud or harm another, namely, [R.P.], knowingly make a false alteration [of] a governmental record, to-wit: temporary identification card, said false alteration being a picture of the defendant with the information of [R.P.]

The elements for tampering with a governmental record under section 37.10(a)(1) are that (1) a person (2) knowingly make a false entry in or a false alteration of (3) a governmental record. *Id.* According to its plain language, section 37.10(a)(1) requires the document to be an authentic "governmental record." *See id.*; *cf.* Tex. Penal Code Ann. § 37.10(a)(2) (allowing offense to be committed with a falsified governmental record). A counterfeit government document is not a governmental record. *See Alfaro-Jimenez*, 2019 WL 2814864, at *6 (holding that a fake social security card is not a governmental record); *Thompson v. State*, 215 S.W.3d 557, 559 (Tex. App.—Texarkana 2007, no pet.) (holding that a counterfeit driver's license is not a governmental record).

The Penal Code defines a governmental record as

(A) anything belonging to, received by, or kept by government for information, including a court record;

(B) anything required by law to be kept by others for information of government;

(C) a license, certificate, permit, . . . or similar document issued by government, by another state, or by the United States[.]

. . .

11

Tex. Penal Code Ann. § 37.01(2) (West 2016). The jury charge instructed the jury that a governmental record "means anything belonging to, received by, or kept by government for information, including a temporary permit." By indicting Neuwirth for tampering with a governmental record under section 37.10(a)(1), the State was required to prove that the temporary identification card at issue was an authentic governmental record. *See Alfaro-Jimenez*, 2019 WL 2814864, at *5.

During opening statements, the prosecutor stated that Neuwirth had "created a fake I.D." so that he could buy items using stolen checks. St. Romain testified that during the search of the vehicle, he found "what appeared to be a temporary identification card on a white piece of paper that you get when you go to the DPS office[,]" and that the document had Neuwirth's photograph and R.P's identifying information. St. Romain testified that the temporary identification card was fictitious, and St. Romain explained that the identification card showed that it was signed by an employee of the Texas Department of Public Safety on a date that the office would have been closed for a holiday. Additionally, R.P. testified that he had never seen the temporary identification card containing his identifying information and Neuwirth's photograph.

Slusher testified that he found temporary identification cards and permits which contained Neuwirth's photograph, and Slusher explained that temporary

identification cards and permits are governmental records. Slusher also explained that he found templates that appeared to be for Texas identification cards on the electronic devices found in Neuwirth's vehicle, as well as various identification-style photographs of individuals. Detective Pierman testified that he interviewed Neuwirth at the county jail, and the trial court admitted a recording of the interview into evidence without objection. During the interview, Neuwirth stated that someone had given him R.P.'s checkbook and that he made an I.D. so he could use the checkbook. Neuwirth explained that he was making fraudulent paper I.D. cards. During closing argument, the prosecutor again argued that Neuwirth committed the offense of tampering with a governmental record by creating an I.D. using R.P.'s information.

Viewing all the evidence in the light most favorable to the verdict, a rational juror could not conclude, beyond a reasonable doubt, that Neuwirth committed the offense of tampering with a governmental record as charged in the indictment. *See* Tex. Penal Code Ann. § 37.10(a)(1), (d); *Jackson*, 443 U.S. at 319; *see also Hooper*, 214 S.W.3d at 13. We conclude that the evidence is legally insufficient to support

Neuwirth's conviction for the offense of tampering with a governmental record. Accordingly, we sustain issue five as to trial cause number 17-09-11252-CR.[1]

We now turn to trial cause number 17-09-11254-CR. In issues one through four, Neuwirth argues that the trial court erred in overruling his motion to suppress. We review a trial court's ruling on a motion to suppress using a bifurcated standard of review. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). We give almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that rely on credibility determinations if they are supported by the record. *Id*.; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). However, we review *de novo* questions of law and mixed questions of law and fact that do not rely on credibility determinations. *Kerwick*, 393 S.W.3d at 273. When, as here, a trial court does not make written findings explaining the factual basis for its decision, we imply findings of fact that support the trial court's ruling if the

---

[1] We note that the State argues that in the event we sustain Neuwirth's sufficiency challenge, we should reform the judgment for the lesser included offense of third-degree-felony forgery rather than acquit. In support of its argument, the State cites *Thornton v. State*, 425 S.W.3d 289 (Tex. Crim. App. 2014). We hold that *Thornton* is distinguishable. In *Thornton*, the Court of Criminal Appeals held that the jury's guilty verdict as to tampering with evidence necessarily constituted a finding that the defendant attempted to tamper with evidence. *See id.* at 303. Here, the State failed to prove the offense as alleged in the indictment. *See Alfaro-Jimenez*, 2019 WL 2814864, at *5-6.

evidence supports those implied findings. *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011). At a hearing on a motion to suppress, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). A trial court may choose to believe or to disbelieve any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). We must uphold the trial court's ruling on a motion to suppress if the ruling was supported by the record and was correct under any theory of law applicable to the case. *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

In issue one, Neuwirth argues that there was no reasonable suspicion that he committed a traffic offense. An officer who witnesses a traffic violation has authority to stop the vehicle. *Strauss v. State*, 121 S.W.3d 486, 490 (Tex. App.—Amarillo 2003, pet. ref'd); *Magic v. State*, 878 S.W.2d 309, 312 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). An officer has reasonable suspicion to make a warrantless traffic stop if the officer has "'specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity.'" *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015) (quoting *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013)).

The Transportation Code provides that "[a]n operator of a vehicle may not drive at a speed greater than is reasonable and prudent under the circumstances then existing." Tex. Transp. Code Ann. § 545.351(a) (West 2011). The Transportation Code also requires an operator of a vehicle to use a signal to indicate an intention to change lanes. *Id.* § 545.104(a) (West 2011). The question is not whether Neuwirth was guilty of the traffic offenses, but whether St. Romain had a reasonable suspicion that Neuwirth was guilty. *See Jaganathan*, 479 S.W.3d at 247. Neuwirth argues that St. Romain failed to articulate any objective facts to support his allegation that Neuwirth was speeding or driving in an unsafe manner and that the video is indisputable evidence that St. Romain did not see any lane change violations.

St. Romain testified that he observed Neuwirth traveling at a high rate of speed, and he explained that Neuwirth's speed was unsafe due to the existing circumstances and traffic patterns in the area. St. Romain explained that Neuwirth appeared to be putting other motorists in danger because he was driving fast near a business that had a lot of in-and-out traffic, and he was approaching a very busy intersection where the speed limit decreased. St. Romain also testified that he observed Neuwirth change lanes without signaling, and although that violation may not be clearly seen in the video, we note that there is a difference between what an officer sees during an ongoing event and what can be seen when reviewing a video.

16

*See id.* at 248. The video supports St. Romain's testimony that he had to speed to catch up with Neuwirth, as the video shows that St. Romain accelerated up to ninety-two miles per hour while trying to catch Neuwirth. Based on this record, we conclude that St. Romain had reasonable suspicion to conduct a traffic stop. *See id.* at 247. We overrule issue one.

In issue two, Neuwirth argues that the police did not have reasonable articulable suspicion to prolong the detention beyond the purpose of the traffic stop. "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). A routine traffic stop is analogous to a *Terry* stop, during which "the tolerable duration of police inquiries . . . is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop . . . and attend to related safety concerns[.]" *Id.* (internal citations omitted). Because addressing the traffic violation is the purpose of the traffic stop, authority for the seizure ends when the tasks tied to the traffic violation are completed or reasonably should have been completed. *Id.*

A traffic stop becomes unlawful when it is prolonged beyond the time reasonably required to complete the mission of the traffic stop, which includes ordinary inquiries incident to the stop. *Id.* at 1614-15. Typical inquiries include, among other things, checking the driver's license and inspecting the vehicle's proof

of insurance. *Id.* at 1615. An officer may conduct a computer verification of the person's license and insurance, and the traffic-stop investigation is not complete until the check is complete, and the officer confirms that the person has a valid license and insurance. *Kothe v. State*, 152 S.W.3d 54, 63-64 (Tex. Crim. App. 2004); *see Straus*, 121 S.W.3d at 491.

Because traffic stops can be dangerous, an officer may need to take certain safety precautions to complete his mission safely, including on-scene investigations into other crimes. *See Kothe*, 152 S.W.3d at 63-64. If, during a valid detention, a police officer develops reasonable suspicion that the detainee is engaged in criminal activity other than a traffic violation, prolonged detention is justified. *Martinez v. State*, 500 S.W.3d 456, 468 (Tex. App.—Beaumont 2016, pet. ref'd). Nervousness and a prior criminal record are factors that an officer may consider in establishing reasonable suspicion for an investigative detention. *Hamal v. State*, 390 S.W.3d 302, 308 (Tex. Crim. App. 2012). An officer may also ask the driver if he possesses any illegal contraband and then solicit his voluntary consent to search the vehicle. *Straus*, 121 S.W.3d at 491. If a valid traffic stop evolves into an investigative detention for a drug-related offense, the temporary detention may continue for a reasonable time, and one reasonable method of dispelling the reasonable suspicion that a vehicle

contains drugs is to have a trained drug dog perform an "open air" search by walking around the vehicle. *Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014).

The record does not support Neuwirth's contention that St. Romain prolonged the detention beyond the time reasonably required to complete the purpose of the traffic stop, because St. Romain testified that he had not completed his investigation when he advised Neuwirth that his dog was going to do an open-air search of the vehicle's exterior. *See Rodriguez*, 135 S.Ct. at 1614-15; *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005). We also note that the record shows that St. Romain developed reasonable suspicion that Neuwirth was engaged in criminal activity other than a traffic violation. St. Romain testified that he observed what appeared to be a switchblade or a large knife and the butt of a handgun in the center console, and St. Romain explained Neuwirth was very evasive, failed to keep eye contact, and kept looking down at the backpack in the floorboard. *See Martinez*, 500 S.W.3d at 468. St. Romain also testified that Neuwirth reported that he had a prior conviction for possession of a controlled substance, was acting fidgety, and denied having drugs in the vehicle when St. Romain asked if he had anything illegal. *See Hamal*, 390 S.W.3d at 308; *Straus*, 121 S.W.3d at 491.

Because the record shows that St. Romain developed a reasonable suspicion that Neuwirth was engaged in criminal activity other than a traffic violation, he was

19

justified in prolonging the detention beyond the scope of the traffic stop. *See Martinez*, 500 S.W.3d at 468. Additionally, once St. Romain developed a reasonable suspicion that Neuwirth was engaged in criminal activity, it was reasonable for him to dispel his suspicion by having the dog perform an "open air" search by walking around the vehicle. *See Matthews*, 431 S.W.3d at 603. The evidence in the record shows that St. Romain pointed to specific facts that allowed the trial court to conclude that an objectively reasonable officer could have suspected criminal activity, that the investigation occurred in a reasonably short period of time, and that St. Romain investigated his suspicion in a manner reasonably designed to quickly resolve his suspicions. *See Martinez*, 500 S.W.3d at 470. We conclude that Neuwirth's detention was not unduly prolonged. *See id.* We overrule issue two.

In issue three, Neuwirth argues that the dog sniff was unreliable to support a search or arrest. The State argues that because Neuwirth failed to challenge the reliability of the drug-detection dog, he has failed to preserve this issue for our review. To preserve a complaint for appellate review, the record must demonstrate that the appellant made his particular complaint known to the trial court by a timely request, objection, or motion, and that the trial court ruled on the request, objection, or motion. Tex. R. App. P. 33.1(a); *see Ross v. State*, 678 S.W.2d 491, 493 (Tex. Crim. App. 1984).

The record reflects Neuwirth failed to challenge the reliability of the dog sniff in his motion to suppress. The record also shows that Neuwirth did not challenge the reliability of the drug dog during the suppression hearing or during trial. [] Because Neuwirth did not voice his doubts about the drug dog's reliability in the trial court, he cannot now do so on appeal. *Florida v. Harris*, 568 U.S. 237, 249 (2013). We conclude that Neuwirth has failed to preserve this issue for our review. *See* Tex. R. App. P. 33.1(a). We overrule issue three.

In issue four, Neuwirth complains that the police did not have probable cause for a search or arrest. In response, the State argues that the evidence showing that the dog alerted on Neuwirth's vehicle gave police probable cause to search the vehicle without a warrant. The use of a drug dog to sniff around the exterior of a motorist's vehicle during a lawful traffic stop does not violate the Fourth Amendment because it merely reveals the location of a substance that the individual has no right to possess. *Caballes*, 543 U.S. at 409. As discussed above, the traffic stop was lawful because St. Romain had the authority to stop Neuwirth after observing Neuwirth commit traffic violations. *See Strauss*, 121 S.W.3d at 490; *Magic*, 878 S.W.2d at 312. The traffic stop never became unlawful because the record shows that St. Romain did not prolong the traffic stop beyond the time reasonably required to complete his investigation. *See Caballes*, 543 U.S. at 407-08.

21

When a drug dog alerts, "the presence of drugs is confirmed, and police may make a warrantless search." *Matthews*, 431 S.W.3d at 603-04. When the dog alerted on Neuwirth's vehicle, St. Romain had probable cause to search Neuwirth's vehicle without a warrant. *See Branch v. State*, 335 S.W.3d 893, 901 (Tex. App.—Austin 2011, pet. ref'd). The dog's alert was also sufficient to establish probable cause for Neuwirth's arrest. *See id.* Because the dog's alert furnished probable cause for St. Romain to arrest Neuwirth and search his vehicle, we overrule issue four. Having overruled issues one through four, we conclude that the trial court did not err by denying Neuwirth's motion to suppress. *See Kerwick*, 393 S.W.3d at 273; *Guzman*, 955 S.W.2d at 89; *see also Meekins*, 340 S.W.3d at 460.

Conclusion

We sustained issue five and concluded that the evidence is legally insufficient to support Neuwirth's conviction for the offense of tampering with a governmental record. Accordingly, we reverse the trial court's judgment in trial cause number 17-09-11252-CR and render judgment of acquittal. Having overruled issues one through four and concluded that the trial court did not err in overruling Neuwirth's motion to suppress, we affirm the trial court's judgment in trial cause number 17-09-11254-CR.

REVERSED AND RENDERED; AFFIRMED.

22

_____
STEVE McKEITHEN
Chief Justice

Submitted on July 22, 2019
Opinion Delivered August 21, 2019
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

23